1               UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

3    UNITED STATES OF AMERICA,
                                        Case No. 4:20-cr-00142-SDJ-KPJ
4              Plaintiff,

5    v.                                 Sherman, Texas
                                        June 18, 2020
6    DANIEL AUSTIN DUNN, also known     10:42 a.m.
     as Whiskey Tango10, also known
7    as Osama bin Drinkin, also
     known as SirAustinOfDunn,
8
               Defendant.
9

10               TRANSCRIPT OF DETENTION HEARING
            BEFORE THE HONORABLE CHRISTINE A. NOWAK
11               UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:
     For the Plaintiff:          Maureen Smith, Esquire
13                               U.S. Attorney's Office
                                 101 E. Park Boulevard
14                               Suite 500
                                 Plano, TX 75074
15
     For the Defendant:          Temani Adams, Esquire
16                               Temani Adams, PLLC
                                 3824 Cedar Springs Road #179
17                               Dallas, TX 75219

18   Court Recorder/Clerk:       Karen Lee

19   Transcription Service:      Chris Hwang
                                 Abba Reporting
20                               PO Box 223282
                                 Chantilly, Virginia  20153
21                               (518) 302-6772

22

23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1                                   **INDEX**

2

3       <u>WITNESSES FOR PLAINTIFF</u>    <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>    <u>Recross</u>

        Jeffrey Cotner              5          13
4

5       <u>WITNESSES FOR DEFENDANT</u>

6       Bailey Decker               24         32

7       Rick Dunn                   37         47         50

8       Judy Dunn                   51

9

10      <u>EXHIBITS</u>                                         <u>OFFERED</u>    <u>RECD</u>

11          Defendant's 1 through 6                      36         36

12          Defendant's 7                                58         58

13          Defendant's 8                                61         61

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 10:42 a.m.)

2               THE COURT:  At this time, the Court will call cause

3     number 420CR142, the United States of America v. Daniel Austin

4     Dunn.

5               If I can have an appearance on behalf of Government,

6     please?

7               MS. SMITH:  Yes, Your Honor.  Maureen Smith for the

8     United States.  We're ready to proceed.

9               THE COURT:  Thank you.

10              If I can have an appearance on behalf of Mr. Dunn?

11              MS. ADAMS:  And Temani Adams for Mr. Dunn.  And I am

12     ready to proceed, Your Honor.

13              THE COURT:  Thank you.

14              And, Mr. Dunn, sir, can you please state your full

15     name for my record?

16              THE DEFENDANT:  Daniel Austin Dunn.

17              THE COURT:  All right.  Now, Mr. Dunn, you and I have

18     been together on two prior occasions now via video for your

19     initial appearance and your arraignment.  We are scheduled

20     today to proceed on the Government's motion for detention.

21              I will just have the Government confirm at this time

22     that they persist in the request to detain?

23              MS. SMITH:  Yes, Your Honor.

24              THE COURT:  And, Ms. Adams, I'll have you confirm

25     that you and your client continue to persist in your request

1    for a contested detention hearing?

2            MS. ADAMS:  Yes, Your Honor.

3            THE COURT:  All right, so at this time, I'll confirm

4    that each of the Government and Defense counsel have had an

5    opportunity to review the Pre-trial Services Report and its

6    recommendation for detention?

7            MS. SMITH:  Yes, Your Honor.

8            MS. ADAMS:  Yes, Your Honor.

9            THE COURT:  Okay, and is this a presumption case?

10           MS. SMITH:  I do not believe it is, Your Honor.

11           THE COURT:  Okay, and Ms. Adams, do you concur that

12   this is not a presumption case?

13           MS. ADAMS:  Yes, Your Honor.

14           THE COURT:  All right, in light of that then, Mr.

15   Dunn, I'm going to ask if you'll please take a seat at the

16   table?

17           And the Government may call its first witness.

18           MS. SMITH:  Yes, Your Honor.  The Government calls

19   FBI Special Agent Jeff Cotner.

20           THE COURT:  Oh, if you'll be sworn just for a second

21   and then you can go have a seat.

22                        JEFFREY COTNER

23   called as a witness for the Plaintiff/Government, having been

24   duly sworn testified as follows:

25           THE COURT:  All right, now you may grab a seat.  And

 1    before you begin, if you'll state your full name into the

 2    microphone, as well as spell it?

 3              THE WITNESS:  Jeffrey Brian Cotner, J-E-F-F-R-E-Y,

 4    Brian, B-R-I-A-N, C-O-T-N-E-R.

 5              THE COURT:  Thank you.

 6              You may proceed.

 7              MS. SMITH:  Thank you.

 8                         DIRECT EXAMINATION

 9    BY MS. SMITH:

10        Q    Good morning, Agent Cotner.  Can you say what agency

11    you're with, please?

12        A    FBI.

13        Q    And how long have you been with the FBI?

14        A    I joined the FBI in November of 2006.

15        Q    Okay, and within that agency, what are your duties?

16        A    I'm currently assigned to investigate domestic

17    terrorism as a special agent.

18        Q    Okay, and in your capacity as an FBI agent in that

19    role, did you become involved in an investigation that led to

20    the indictment of Daniel Austin Dunn?

21        A    Yes.

22        Q    And do you see Mr. Dunn in the courtroom?

23        A    Yes, I do.

24        Q    Would you point him out and describe something he's

25    wearing, please?

1        A     Right here at this table with the glasses and face

2    mask.

3              MS. SMITH:   Okay, Your Honor, will the record reflect

4    that Agent Cotner has identified Daniel Austin Dunn?

5              THE COURT:   The record shall so reflect.

6              MS. SMITH:   Thank you.

7    BY MS. SMITH:

8        Q     Now how did you get involved or how did you know

9    about this investigation?   What got your attention?

10       A     The FBI received information that Mr. Dunn was

11   posting threats towards law enforcement on the Internet, using

12   his Facebook and Twitter accounts.   From approximately June 1st

13   to June 6th, he made a series of threats at various times

14   throughout the day.

15       Some examples of the threats were shoot them, line them up

16   and shoot them, start shooting back.   And he has over 1,800

17   followers or Facebook friends and over 2,000 Twitter followers.

18       Q     Okay, when you are saying the threats were shoot

19   them, when you're talking about them, who was Mr. Dunn

20   referring to?

21       A     He was referring to law enforcement.   This was also

22   during a period of civil unrest with ongoing protest and riots.

23       Q     Okay, this was the unrest that happened following the

24   death of George Floyd, correct?

25       A     Yes, ma'am.

1    Q    Okay, and how do you know that it was this Defendant,

2  Daniel Dunn, who was posting those threats?

3    A    The profile pictures on his social media accounts

4  matches his driver's license photo.

5    Q    Okay, and did these threats result in responses from

6  other people?

7    A    Yes, some of his Facebook friends did respond I

8  concur, that's me at the Dallas Police Department, and direct

9  our raids towards the proper location or something similar to

10  that effect.

11    Q    Okay, so once you discovered that Mr. Dunn was

12  posting these threats and people were responding, what did you

13  do in your investigation?

14    A    Let's see.  We -- I started writing a search warrant

15  for his social media accounts, his Facebook account, his

16  Twitter account, and a search warrant for his residence.

17    Q    Okay, and were you able to get those search warrants

18  signed?

19    A    Yes.

20    Q    All right, and so you were able to in fact confirm

21  that those threats being posted were from Mr. Dunn's account

22  based on the Facebook and Twitter accounts?

23    A    Yes.

24    Q    Okay, and then, what did -- when did you perform a

25  search on his residence?

1        A      June 9th, I believe.

2        Q      Okay, and when you did conduct that search warrant,

3    did you find anything illegal in his home?

4        A      There was a small user quantity of marijuana on the

5    coffee table in the living room, along with a bong.

6        Q      Okay, and then, did you also find firearms?

7        A      Yes, we found three firearms, a .40 caliber pistol, a

8    12 gauge shotgun, and a .270 caliber hunting rifle.

9        Q      Okay, were -- and those were in the same house with

10   the marijuana; is that correct?

11       A      Yes, ma'am.

12       Q      Okay, do you have information about whether or not

13   Mr. Dunn is a regular marijuana user?

14       A      I do.

15       Q      And what is that?

16       A      We -- someone in the FBI talked to his Denton County

17   probation officer.  And she advised that he, from November 2014

18   to May 2019, he failed his drug test approximately 23 times.

19   Most of those were for marijuana, but six of them were for

20   cocaine.

21       Q      Okay, and where was Mr. Dunn on probation?

22       A      I'm sorry, what?

23       Q      Where was he on probation?

24       A      It started in Lubbock County, but he transferred to

25   Denton County.

1    Q    Okay, and are you aware of what Mr. Dunn was on

2    probation for?

3    A    Yes.

4    Q    And what are those?  What's his criminal history?

5    A    In September of 2012, Mr. Dunn was arrested by the

6    Lubbock Police Department for public intoxication and

7    discharging a firearm in a municipality.

8    And during this incident, he got into a dispute with

9    another male over a female and fired his weapon during that

10   dispute.

11   A few weeks after that, he was arrested again by Lubbock

12   Police Department for, let's see, stalking, tampering with a

13   witness, I'm sorry, stalking, retaliation, public intoxication,

14   and unlawful carrying of a weapon.

15   Q    Okay.

16   A    During this incident, he had a double serrated knife

17   on him.  That is considered a dagger and is illegal in the

18   state of the Texas.  He allegedly slashed the tires of the

19   victim's vehicle that he had the dispute with.

20   And then, a few weeks after that, now in October of 2012,

21   he was arrested again by Lubbock Police Department.  This time,

22   he was arrested for coercion, tampering with a witness, and

23   stalking.  During this incident, he allegedly fired a B.B. gun

24   into or at the victim's house.

25   Q    Okay, and from those incidents, was he -- he was not

1   convicted of all those different charges; is that correct?

2       A    Correct, those charges were combined or reduced down

3   to two charges.  And he served six years probation for the

4   retaliation and 24 months probation for the unlawful carrying

5   of a weapon.

6       Q    Okay, and in your investigation, are you aware of

7   whether or not he was successful on his probation?  Let --

8       A    Due to the drug tests, he violated his probation

9   several times.

10      Q    Okay, in fact, were there two motions to adjudicate

11  his probation based on his violations?

12      A    I believe so.

13      Q    And then, he finally successfully completed his

14  probation in April of this year; is that correct?

15      A    Yes.

16      Q    And then, June of this year is when you found the

17  firearms and the marijuana in his home, correct?

18      A    Yes.

19      Q    Has he admitted or has anyone that is close to him

20  told you during your investigation that he continues to smoke

21  marijuana?

22      A    His girlfriend was interviewed and she said that she

23  brought the marijuana from the state of Washington, where it's

24  legal, and that it was hers and the bong was hers, but that he

25  had smoked it occasionally with her.

1   Q Okay.  Now did you have an opportunity to interview

2 Mr. Dunn's probation officer that was supervising him?

3   A I talked to her on the telephone, yes.

4   Q And based on your interview with her, do you have

5 reason to believe that he would be a danger to the community if

6 released?

7   A Yes, some of the information that she provided was

8 that he is strongly anti-government, can become violent if

9 somebody says the wrong thing.

10   She said that he told her that she was the only person in

11 law enforcement that he did not want to kill.  She believed him

12 to have firearms in his residence.  This is prior, I mean,

13 before we executed the search warrant.

14   And she also said that he's been conducting martial arts

15 that involve stick fighting and knife fighting.  So that was

16 because of all these reasons in his criminal history and the

17 threats towards law enforcement, that's why the S.W.A.T. team

18 was used to affect the arrest and search.

19   Q Okay.  And when you searched his home, does he live

20 by himself or what are the circumstances of where he lives?

21   A He lives on I'd say five to six acres.  His parents

22 have a house on that land and then he has a one bedroom, one

23 bath house also on the land.

24   Q Okay.

25   A And in that house was his girlfriend at the time of

 1    the search.

 2         Q    All right.  Now are you familiar with Mr. Dunn's

 3    military record?

 4         A    Yes.

 5         Q    And what did you learn about that in your

 6    investigation?

 7         A    We obtained his military records and I reviewed them.

 8    And in 2010, he signed a eight-year commitment with the U.S.

 9    Marine Corps Reserves.

10         And in December of 2012 after he was arrested by Lubbock

11    Police Department, his chain of command recommended that he be

12    discharged and that he receive other than honorable discharge.

13    However, he ultimately did receive a honorable discharge.

14         Q    And do you have any idea of why that was?

15         A    I asked a lady with -- that's in the military that

16    serves on our National Joint Terrorism Task Force.  And she

17    said that it has to be pretty egregious to get the other than

18    honorable and that he would have needed a conviction on his

19    criminal history to get that at that time.

20         Q    Okay.

21         A    He didn't have it and I guess he actually technically

22    wasn't convicted since he served the probation.

23         Q    Okay, and so nevertheless, he did not complete the

24    eight years he signed up for; is that correct?

25         A    Correct.

1        Q     Now based on all these things that you discovered in

2    your investigation, including the facts of this case, do you

3    feel like Mr. Dunn would be a danger to the community if

4    released?

5        A     Yes.

6              MS. SMITH:  We pass the witness, Your Honor.

7              THE COURT:  Thank you.

8              Ms. Adams?

9              MS. ADAMS:  Thank you.

10                         CROSS-EXAMINATION

11   BY MS. ADAMS:

12       Q     I'm so sorry, please tell me your name again?

13       A     It's Jeff Cotner.

14       Q     Cockner?

15       A     Cotner.

16       Q     Cotner, I'm sorry.

17       A     Yes, ma'am.

18       Q     Thank you.  Mr. Cotner, are you familiar with a

19   social media platform such as Facebook and Twitter?

20       A     Yes.

21       Q     And do you understand that there's a difference

22   between a person creating a post and sharing a post?

23       A     Yes.

24       Q     Okay.  And in fact, several of the posts at issue

25   today are shares of someone else's posts, correct?

1      A     Some of them are.

2      Q     Okay, and which ones?

3      A     I know he posted a picture of some police officers in

4   riot gear that are splattered in paint, that has a caption that

5   says something to the effect of this is an effective way to, I

6   don't know, cause problems for the riot police.

7      Q     Uh-huh.

8      A     And that was a re-post.

9      Q     Okay, and what about the one where he says about

10  lining up or shooting back?  What about that one?

11     A     I would have to see it.  I can't --

12     Q     Okay.

13     A     -- tell you off the top of my head.  I know a lot of

14  them, he links pictures or articles and then makes a comment

15  along with it.

16     Q     Okay.

17           MS. ADAMS:  May I approach the witness, Your Honor?

18           THE COURT:  You may.

19           MS. ADAMS:  (Indiscernible) as Exhibit

20  (indiscernible) a number.

21           THE COURT:  Karen can give you a number, but -- and

22  have you showed the Government?

23           MS. ADAMS:  I have additional copies.

24           THE COURT:  Okay, she can give you a number.  Yeah.

25       (Ms. Adams confers with the Clerk)

 1          THE COURT:  Yeah, and then, you can just give her the

 2  stickers for right now, since we're trying to socially

 3  distance.

 4          MS. ADAMS:  And, Your Honor, if you bear with me, I

 5  will also have copies for the Court as well.

 6          THE COURT:  Thank you.

 7          MS. ADAMS:  May I approach?

 8          THE COURT:  I just need to make sure, have you

 9  given -- if you have given her a copy, then you can approach.

10          MS. ADAMS:  Okay.  (Indiscernible) hand you.  This is

11  going to be Exhibit 1, Exhibit 2.  It's for Your Honor.

12          THE COURT:  Yes.  And are these my copies or what you

13  want given to the witness?

14          MS. ADAMS:  No, these are the only copies.

15          THE COURT:  Okay, so let me give you these.

16          MS. ADAMS:  We'll take them.

17          THE COURT:  Okay, thank you.  All right, Ms. Adams,

18  you may proceed.

19          MS. ADAMS:  Thank you.

20  BY MS. ADAMS:

21     Q    I'm showing you what's been marked as Defendant's

22  Exhibit 1 and 2.  Are -- is that the post that says -- refers

23  to shooting back?

24     A    This says start shooting back.

25     Q    Okay, and that is -- and if you look at Exhibit 2,

 1   that is the original post.  Do you see that?

 2        A    Well, these don't have exhibit numbers on them.

 3        Q    Oh.

 4        A    Okay, yes, I see that.

 5        Q    Okay, so that would be a share of someone else's

 6   post?

 7        A    Well, the video and the caption below the video would

 8   be a share, but the comments above that appear to come from

 9   Austin Dunn's account that say start shooting back.

10        Q    Okay, so we're in agreeance that the original post

11   came from someone else with the video.  And it says the user

12   was Mario Wynn (phonetic).  Do you see that on Exhibit 2?

13        A    Yes.

14        Q    Okay.  And you went through Mr. Dunn's Facebook

15   profile.  He posted several other things, did he not?

16        A    Yes.

17        Q    Okay, and on -- let's see.  And in regards to the

18   picture that you referenced stating -- regarding officers being

19   covered with paint?

20        A    Yes.

21        Q    That was also a re-post of someone else's post,

22   correct?

23        A    Yes.

24        Q    Okay.  And in regards to their other post, I believe

25   mentioned that referred to something about like the boogaloo

 1   movement or something like that?  And that was also a re-post

 2   of someone else's post, correct?

 3       A    Yes, but he does offer his own comments.  I believe

 4   Mr. Dunn said something to the effect of these are good people

 5   or good boys.

 6       Q    Uh-huh, and the original, that post went to someone

 7   else's page, correct?

 8       A    Yes.

 9       Q    Okay.  Okay, and at the time, were you present when

10   Mr. Dunn was arrested?

11       A    Yes.

12       Q    Okay, and were there surveillance at his residence

13   prior to that?

14       A    On that day or?

15       Q    Just in general.

16       A    Yes.

17       Q    Okay, and during the surveillance, was Mr. Dunn seen

18   doing anything violent?

19       A    No.

20       Q    Okay, was he seen toting weapons in an aggressive

21   manner or in any manner?

22       A    No.

23       Q    Okay.

24       A    The surveillance consisted mostly of just drive-bys,

25   because it's difficult to do surveillance where he lives.

1      Q     Okay.  And what time did officers come to Mr. Dunn's

2  home?

3      A     6 a.m.

4      Q     Okay, so had the sun come up or was it still dark?

5      A     The sun was coming up.

6      Q     Okay, and how many officers were present?

7      A     I don't know off the top of my head.  There were

8  several officers because when the S.W.A.T. team does an arrest,

9  they have several people.

10     Q     Uh-huh.  And how did officers approach Mr. Dunn

11  from -- meaning did they get knock or did they break down the

12  door?

13     A     I don't think they broke down the door.  I was not at

14  his residence.  I was over at the parents' house just to talk

15  to the dad and explain what was going on.

16         From what I heard, they were calling him out on a P.A.

17  system from the front yard and also called his phone.  If they

18  broke the door, that's possible.  I'm just not aware of that.

19     Q     Okay, because that didn't happen.

20     A     Okay.

21     Q     In fact, is there a report that was created

22  afterwards or did you speak with any other officers who did go

23  to his door?

24     A     There's a report that's been created documenting his

25  arrest and the search.  I have not seen a report that documents

1    the -- like the damage or anything like that.

2        Q    It's okay.  There wasn't.  So you -- are you aware

3    that Mr. Dunn actually came and opened the door for the

4    officers?

5        A    I knew that he was taken into custody without

6    incident.

7        Q    Okay.  And so, there's no -- Mr. Dunn didn't try to

8    flee?

9        A    No.

10       Q    He didn't try to resist arrest?

11       A    No.

12       Q    Okay, and you also talked about firearms in his home.

13   Now Mr. Dunn is not a convicted felon, correct?

14       A    Correct.

15       Q    Okay.  And you also spoke about there being alleged

16   marijuana in his home?

17       A    Yes.

18       Q    And you need a lab test to confirm that it was

19   marijuana, correct?

20       A    His girlfriend confirmed that it was marijuana, but.

21       Q    But you need a lab, because hemp is also quite

22   similar?  And that's legal, correct?

23       A    Yes.

24       Q    Okay.  You also spoke about his probation.  And on

25   his probation, he was successfully discharged from probation;

1     is that correct?

2          A    Yes.

3          Q    Okay, and he had -- you mentioned he had probation

4     violations and each of those were dismissed, correct?

5          A    Yes.

6          Q    Okay.  And let's see, no further questions.

7               THE COURT:   Thank you.

8               Anything?

9               MS. SMITH:   Nothing further, Your Honor.  May he be

10    excused?

11              THE COURT:   No, the Court actually has a question.

12    You all have mentioned a term that I would like the witness to

13    define or describe, so the Court has a better understanding.

14    The term boogaloo has come up.

15              THE WITNESS:   Sure.

16              THE COURT:   Can you advise the Court as to what that

17    term refers to?

18              THE WITNESS:   Sure.  The boogaloo is a slang term

19    that refers to a future civil war that a lot of white

20    nationalists and anti-government extremists believe is going to

21    happen and they are preparing for.

22              THE COURT:   Okay, and I just want to make sure that

23    I'm understanding your testimony.  Are -- is it your testimony

24    here today that you believe that Mr. Dunn is part of that

25    movement?

1       THE WITNESS:  No, I don't have reason to believe he's

2   part of the movement, but he essentially endorsed the boogaloo

3   boys as good people.

4       THE COURT:  Okay.  And in light of the fact that the

5   Court's asked those questions, does the Government have any

6   further questions for this witness?

7       MS. SMITH:  No, Your Honor.

8       THE COURT:  And Ms. Adams, do you have any further

9   questions in light of the fact that I asked those questions?

10       MS. ADAMS:  Yes, I do, Your Honor.

11       THE COURT:  Okay, please go ahead.

12   BY MS. ADAMS:

13   Q    And Mr. -- so these people are alleged white

14   nationalists.  But Mr. Dunn also supports Black Lives Matter.

15   So how -- those are conflicting views.  So how does that work?

16   A    It's not all white nationalists that believe in the

17   boogaloo.  It's a lot of anti-government people as well.

18   Q    Okay.  And if -- referring to that post and I have it

19   if you'd like to see it, it wasn't the -- a man posted the post

20   with a very long paragraph about himself and what he believed

21   in.  Do you recall that?

22   A    Yes.

23   Q    Okay.  No further questions, Your Honor.

24       THE COURT:  Thank you.  If there's nothing further,

25   you may step down.  Thank you.

```
 1              THE WITNESS:  Thank you.

 2         (Witness is excused)

 3              THE COURT:  Does the Government have any further

 4    witnesses to present or evidence to proffer at this time?

 5              MS. SMITH:  No, Your Honor, the Government rests.

 6              THE COURT:  All right, Ms. Adams, you may call your

 7    first witness.

 8              MS. ADAMS:  Your Honor, I call Bailey Decker.

 9                          BAILEY DECKER

10    called as a witness for the Defendant, having been duly sworn

11    testified as follows:

12              THE COURT:  Thank you.

13              Ms. Adams before you begin questioning your witness,

14    may you and the Government please approach?

15              MS. ADAMS:  Okay.

16         (Bench conference with Ms. Smith and Ms. Adams, off the

17    record)

18              THE COURT:  -- record?

19              THE WITNESS:  Bailey Rae Decker.

20              THE COURT:  Thank you.  And, Ms. Decker, if I could

21    ask you for you to please spell your full name?

22              THE WITNESS:  B-A-I-L-E-Y R-A-E D-E-C-K-E-R.

23              THE COURT:  Thank you, Ms. Decker.  All right, so

24    before we proceed here today, I know you've been here in the

25    courtroom and you heard the agent's testimony.
```

1    And so, before we proceed, I do want to confirm that

2    you certainly understand that you have the right not to

3    incriminate yourself while you're here before the Court here

4    today.  Do you understand that?

5        THE WITNESS:  Yes, ma'am.

6        THE COURT:  And so, as it relates to any crimes that

7    you might be alleged to be involved in, you fully understand

8    that you have the right to remain silent and not to say

9    anything that might cause you to be implicated or to adjudge

10   your guilt related to those crimes.  Do you understand that?

11       THE WITNESS:  Yes, ma'am.

12       THE COURT:  Okay, and you've had an opportunity as

13   well to talk with Ms. Adams, who is Mr. Dunn's lawyer, about

14   your constitutional rights.  And following those conversations

15   you made the decision to testify here today; is that correct?

16       THE WITNESS:  Yes, ma'am.

17       THE COURT:  All right, thank you.

18       Ms. Adams, you may proceed.

19       MS. ADAMS:  And Your Honor, before I get started, I

20   just want to go ahead and give the Government my exhibits if

21   that's okay?

22       THE COURT:  Yes, please.

23       MS. ADAMS:  And may I approach, too?

24       THE COURT:  You may.

25       MS. ADAMS:  Thank you.

```
 1                        DIRECT EXAMINATION

 2   BY MS. ADAMS:

 3       Q    Please state your name?

 4       A    Bailey Rae Decker.

 5       Q    And, Ms. Decker, how old are you?

 6       A    20.

 7       Q    And do you have any criminal history?

 8       A    No.

 9       Q    What is your current occupation?

10       A    I am unemployed right now.

11       Q    Okay.  And what is your relation to Mr. Dunn?

12       A    We are dating.

13       Q    Okay, and do you guys live together?

14       A    Yes, ma'am.

15       Q    All right, and for the record, do you and his family

16   call him Mr. Dunn?

17       A    We call him Austin.

18       Q    Okay.  Which -- and that's his middle name?

19       A    Yes.

20       Q    Okay.  And where do you two reside?

21       A    We reside on the same land as his parents, right next

22   door.

23       Q    All right, and how long have you lived there?

24       A    A little -- about a month and a half.

25       Q    Okay, and where did you live before then?
```

25

1      A      Washington state.

2      Q      And you moved here to be with Mr. Dunn?

3      A      Yes, ma'am.

4      Q      Okay, and now did Mr. Dunn ever travel to Washington

5  to visit you?

6      A      No, ma'am.

7      Q      Okay, and why not?

8      A      He was on probation at the time, so he wasn't able to

9  travel to Washington.  And it was easier for me to come out

10  here because I also live with my family up in Washington.

11      Q      Okay, so he was -- he didn't come because he was

12  obeying the rules of his probation?

13      A      Yes, ma'am.

14      Q      Okay, and who lives in your home?

15      A      Me, Austin, and our puppy.

16      Q      Okay.

17          MS. ADAMS:  And may I approach the witness, Your

18  Honor?

19          THE COURT:  You may.  And I can give her these

20  copies, because that's --

21          MS. ADAMS:  Oh, that'd be great.

22  BY MS. ADAMS:

23      Q      And if you go to the last photo, do you recognize

24  that photo?

25      A      Yes, that is our dog Goose (phonetic).

1    Q    Okay, and you guys reaching -- that's the one you

2  adopted?

3    A    Yes.

4    Q    Okay, and let's see.  Now what does Mr. Dunn do for a

5  living?

6    A    He works for ADP, which is a restoration company.

7    Q    Okay, and do you know how long he's worked there?

8    A    I think about a year.

9    Q    Okay, and what else does he do?

10    A    He also has a business with custom leather work.

11    Q    Okay, and I'm going to ask you to look at the other

12  photos.  And how does he sell those goods?

13    A    He sells them over -- he has a business Instagram

14  page and he sells them on Twitter as well.

15    Q    Okay, and looking at I believe Exhibit 3, is that the

16  profile for his leather business?

17    A    Yes, ma'am.

18    Q    Okay, and what about the next pages, the next photos?

19    A    Those are also his business Instagram.

20    Q    Okay, and these are products that he makes and sells?

21    A    Yes, ma'am.

22    Q    Okay.  Is Mr. Dunn the financial caretaker of your

23  home?

24    A    He is.

25    Q    Okay, and he provides for you and your dog?

1       A     Yeah.

2       Q     Well, you all's dog.  I don't --

3       A     Yes, ma'am.

4       Q     You guys share, sorry.  And have you ever known Mr.

5  Dunn to be violent?

6       A     No.

7       Q     Have you ever known Mr. Dunn to harm someone?

8       A     No.

9       Q     Okay, and you know why we're here?

10      A     Yes, ma'am.

11      Q     And you understand the allegations against Mr. Dunn?

12      A     Yes, ma'am.

13      Q     Okay, have you viewed the Facebook posts that are at

14  issue?

15      A     I have.

16      Q     Okay, let's see.  And do you believe that Austin

17  would harm anyone?

18      A     I do not.

19      Q     Okay, do you believe that he would threaten to injure

20  someone?

21      A     No, ma'am.

22      Q     Okay.  Does Austin like really care about people,

23  too?

24      A     Yes, ma'am.

25      Q     Okay.  And with -- what was going on in America at

1   the time that these posts were shared?

2       A    There was protests due to George Floyd's death and

3   police brutality against black people.

4       Q    Okay, so Mr. Dunn was upset about how people were

5   being treated?

6       A    Yes, ma'am.

7       Q    All right.  And he didn't -- on one of the posts at

8   issue, it was after the cops had pushed a older man down?  Do

9   you recall that post?

10      A    Yes.

11      Q    Okay, and that made Austin, I'm sorry Austin, Mr.

12  Dunn upset?

13      A    Yes, ma'am.

14      Q    Now do you believe that Mr. Dunn is going to hurt

15  officers?

16      A    No, ma'am.

17      Q    Or anyone else?

18      A    No.

19      Q    In regards to most of the posts, did Mr. Dunn create

20  them or were there -- would he share those?

21      A    He shared most of them.

22      Q    All right.  Let's talk about the day of Mr. Dunn's

23  arrest.  When was he arrested?

24      A    I believe it was June 9th.

25      Q    Okay.  Was it early in the morning?

```
 1        A    Yes, ma'am.

 2        Q    Were you guys still sleeping or?

 3        A    Yes, we were still sleeping.

 4        Q    And what happened?

 5        A    We woke up to loud knocking on the door and yelling.

 6   Austin got out of bed and opened up the door.  And the S.W.A.T.

 7   was standing there.

 8        Q    All right.  Did Mr. Dunn obey the officer's orders?

 9        A    Yes, ma'am.

10        Q    Okay.  Did Mr. Dunn ever try to run?

11        A    No.

12        Q    Did he ever try to resist arrest?

13        A    No.

14        Q    So he was compliant?

15        A    Yes.

16        Q    Okay, was there any type of issue at all with

17   regarding his arrest?

18        A    No.

19        Q    Okay.  Now last week, some officers came to your home

20   and asked you questions?

21        Q    Yes, ma'am.

22        Q    All right, and you were compliant?

23        A    Yes.

24        Q    At some point, there was a bong with what appeared to

25   marijuana or hemp present in the home?
```

1        A     Yes.

2        Q     All right.  And you told the officers that it was

3   yours?

4        A     Yes, ma'am.

5        Q     Okay, and did you also tell officers that Mr. Dunn

6   smokes occasionally?

7        A     I did.

8        Q     Okay, and why did you say that?

9        A     I was nervous and scared.  I didn't want anyone to

10  get in trouble because I don't know if Austin actually smokes

11  or not, because it was mine.

12       Q     Okay.  Now you guys did have some firearms in your

13  home?

14       A     Yes, ma'am.

15       Q     All right, and where did -- who did those guns belong

16  to?

17       A     Austin.

18       Q     Okay, and where did he get those from?

19       A     Two of them, he got back from Lubbock County when we

20  got off of probation.

21       Q     Okay, and how do you know that?

22       A     I went with him to pick them up.

23       Q     So the police gave him those guns?

24       A     Yes, ma'am.

25       Q     Now does the home that you and Mr. Dunn share have a

1    landline telephone?

2         A    No, it does not.

3         Q    All right, if the Court wanted a landline to give him

4    a curfew to call to make sure he was home, would you be okay

5    with getting one?

6         A    Yes, ma'am.

7         Q    All right.  If the Court releases Mr. Dunn, would you

8    be willing to assist in making sure he gets to his court

9    settings?

10        A    Yes, ma'am.

11        Q    Do you all have any type of large amounts of cash or

12   anything to -- if he wanted to flee or anything like that?

13        A    No, ma'am.

14        Q    All right.  Does Mr. Dunn have a passport?

15        A    No.

16        Q    All right, if Mr. Dunn wanted to flee, would you

17   assist him?

18        A    No, ma'am.

19        Q    All right, if the Court gives Mr. Dunn a set of rules

20   to abide by, kind of like with the probation thing, would you

21   help to make sure that he complies with all the rules?

22        A    Yes, ma'am.

23        Q    All right, do you believe that Mr. Dunn is a danger

24   to society?

25        A    No, ma'am.

1    Q    Or a danger to anyone?

2    A    No.

3    Q    Okay.

4         MS. ADAMS:  No further questions, Your Honor.

5         THE COURT:  Thank you.

6                        CROSS-EXAMINATION

7    BY MS. SMITH:

8    Q    Good morning, Ms. Decker.

9    A    Good morning.

10   Q    You said you came down here from Washington state?

11   A    Yes, ma'am.

12   Q    When did you get here?

13   A    I believe it was May 4th or 5th.

14   Q    Of this year?

15   A    It was a Monday, yes.

16   Q    So you'd been down here less than two months?

17   A    Yes, ma'am.

18   Q    A little over one month?

19   A    Yes, ma'am.

20   Q    How did you and Mr. Dunn meet?

21   A    We met a year ago over Twitter.

22   Q    Okay, and what kind of site were you on that you met

23   him?

24   A    Twitter.

25   Q    Was it just Twitter and you had -- how did you happen

1    upon him?  What, did you have something in common or?

2         A    I -- we just had common followers and we ended up

3    following each other at some point.

4         Q    Okay, and so you met him a year ago on Twitter, and

5    then, I'm assuming your relationship grew and you decided to

6    move down here?

7         A    Yes, I visited him about seven times before I came

8    down.

9         Q    Okay, so he was on probation a couple of the times

10   while you visited him?

11        A    Yes, ma'am.

12        Q    And then he moved down here and you've been here a

13   month and a half?

14        A    Yes, ma'am.

15        Q    You all live together?

16        A    Yes, ma'am.

17        Q    And so, I guess you're pretty much together every day

18   since really nobody's working these days much, right?

19        A    Yes, ma'am.

20        Q    But you're telling the Court that you don't know if

21   he smokes marijuana or not?

22        A    We're not together every second of the day.  One of

23   us has to go to the store or someone's sleeping.

24        A    Okay.

25        Q    So if he's smoking marijuana, he's sneaking around

1   and doing it behind your back?

2        A    I would not say he's sneaking around.

3        Q    He's not doing it in front of you, right?

4        A    Yeah, but I wouldn't say he's sneaking around, hiding

5   it.

6        Q    But you have not seen him smoke it is what you're

7   saying?

8        A    Yes, ma'am.

9        Q    And the marijuana was yours.  You brought it from

10  Washington?

11       A    I did not bring it from Washington.

12       Q    Where did you get it?

13       A    I believed I bought hemp from somewhere out here.

14       Q    Were you smoking it?

15       A    Yes, ma'am.

16       Q    Now do you have a Facebook and Twitter?  Do you post

17  on social media?

18       A    Yes, ma'am.

19       Q    Okay, what kind of sites do you post on?  Do you have

20  any of these organizations that you belong to?

21       A    No, ma'am.

22       Q    Okay, and then, you were not -- you did not know Mr.

23  Dunn when he was actually on probation in Lubbock, right?

24       A    No, ma'am.

25       Q    You don't know what happened out there?  You weren't

1   part of those things, right?

2        A    No, ma'am.

3             MS. SMITH:  Okay.  I'll pass the witness, Your Honor.

4             THE COURT:  Thank you.

5             Ms. Adams, anything further for this witness?

6             MS. ADAMS:  Nothing further.

7             THE COURT:  All right, thank you, ma'am.  You may

8   step down.

9             THE WITNESS:  Do you want --

10            THE COURT:  Yes, I will take those back.  Thank you

11  very much, Ms. Decker.  Appreciate it.

12       (The Judge confers with the Clerk)

13            THE COURT:  Ms. Adams, before you call your next

14  witness, can I just confirm, do you have them marked 1 and 2?

15            MS. ADAMS:  No.

16            THE COURT:  Oh, did he take them back?

17            Mr. -- Agent Cotner, did you back to your table

18  marked 1 and 2?  Do you mind handing those to Karen?

19            MR. COTNER:  Sure.

20            THE COURT:  And we can give you these unmarked

21  copies.  I need to make sure that I keep all the marked copies

22  with me.

23            MS. ADAMS:  I understand, Your Honor.

24            THE COURT:  All right, and then Ms. Adams, just to

25  confirm, because at this time, you haven't moved to admit any

1  of these.  Are you moving to admit Exhibits 1, 2, and 3, 4, and

2  5?

3           MS. ADAMS:  Yes, Your --

4           THE COURT:  And is this --

5           MS. ADAMS:  -- 6.

6           THE COURT:  -- 6, yes.

7           MS. ADAMS:  Yes, I am, Your Honor.

8           THE COURT:  Is there any objection to --

9           MS. SMITH:  No, Your Honor.

10          THE COURT:  Okay, there being no objection,

11  Defendant's Exhibits 1 through 6 will be admitted.  All right,

12  Ms. Adams, you may call your next witness.

13       (Defendant's Exhibits 1 through 6 admitted into evidence)

14          MS. ADAMS:  I would like to call Rick Dunn, Your

15  Honor.

16          THE COURT:  Thank you.

17                        RICK DUNN

18  called as a witness for the Defendant, having been duly sworn

19  testified as follows:

20          THE COURT:  All right, sir, if I could ask, if you'll

21  state your full name and if you'll spell it as well for me,

22  please.

23          THE WITNESS:  Rick Andrew Dunn, R-I-C-K A-N-D-R-E-W

24  D-U-N-N.

25          THE COURT:  Thank you very much.

```
 1                    Ms. Adams, you may proceed.

 2                    MS. ADAMS:   Thank you, Your Honor.

 3                          DIRECT EXAMINATION

 4     BY MS. ADAMS:

 5          Q    Mr. Dunn, how old are you?

 6          A    65.

 7          Q    Okay, and do you have any criminal history?

 8          A    I'm sorry?

 9          Q    I'm sorry.  Do you have any criminal history?

10          A    No, ma'am.

11          Q    Okay, and are you currently employed?

12          A    I'm retired.

13          A    All right, and what did you do before you retired?

14          A    I was a pilot for Southwest Airlines and also a

15     federal agent for Department of Homeland Security.

16          Q    Okay, and how long were you working as a federal

17     agent for the Homeland Security?

18          A    15 years, from 2005.

19          Q    Uh-huh, and when did you retire from your federal

20     job?

21          A    In April of this year.

22          Q    All right.  And are you currently married?

23          A    Yes, ma'am.

24          Q    All right, and how long have you been married?

25          A    32 years.
```

```
 1        Q    Okay, and what is your relation to Mr. Dunn?

 2        A    He's my youngest son.

 3             MS. ADAMS:  Okay, and Your Honor, I have for clarity,

 4   he's Mr. Dunn, and he's Mr. Dunn, so I don't know how you want

 5   me to differentiate in my questions?

 6             THE COURT:  Sir, would you find it acceptable to

 7   refer to you by your first name here today?

 8             THE WITNESS:  That would be great.

 9             THE COURT:  All right, Ms. Adams, if you'll proceed

10   in that manner.

11             MS. ADAMS:  Thank you, Your Honor.

12   BY MS. ADAMS:

13        Q    And your wife is Mr. Dunn's mom?

14        A    Yes, ma'am.

15        Q    Okay, and where do you and your wife reside?

16        A    324 Porter Road, Bartonville, Texas.

17        Q    Okay, and how long have you all lived there?

18        A    We've been there four years.

19        Q    Okay, and where did you all live before you lived in

20   Bartonville?

21        A    We lived in Double Oak, Texas.

22        Q    And how long did you all live there?

23        A    18 years.

24        Q    Okay.  And did Austin also live -- Austin, I'm sorry.

25   Mr. Dunn also live there?
```

```
 1         A     Yes, ma'am.

 2         Q     All right, and the -- your previous home, that's

 3   about how many -- how far is it from Bartonville to Double Oak?

 4         A     Three miles.

 5         Q     All right, let's talk about your current home.  Do

 6   you guys refer to it as a property or just your home?

 7         A     We refer to it as our ranch.

 8         Q     Okay, and how large is your ranch?

 9         A     We have 7 acres and lease another 2 acres, so

10   approximately 9 to 10 acres.

11         Q     And what is on the ranch?

12         A     We have a typical ranch.  We have horses.  We have

13   donkeys, we have chickens, we have goats, we have pigs, farm

14   animals, ranch animals.

15         Q     And there's two homes on the -- on your ranch?

16         A     Yes, ma'am.

17         Q     Okay.  And who lives I guess let's say in the main

18   house?

19         A     Me and my wife.

20         Q     All right, and who lived in the guest house?

21         A     Austin and Bailey, his girlfriend.

22         Q     All right, how far is the guest house from the main

23   house?

24         A     64 feet.

25         Q     So you can see it out the window?
```

1      A     Oh, we can see it out the window and we also have

2    cameras.

3      Q     Okay.  Is there a fence on the ranch?

4      A     Not separating the two houses.  The entire ranch is

5    fenced off, yes.

6      Q     How many children do you have?

7      A     Two boys.

8      Q     And Mr. Dunn is the youngest?

9      A     Yes, ma'am.

10     Q     And you have a -- the oldest.  What is his name?

11     A     John Andrew Dunn.

12     Q     And where does John live?

13     A     Right now, he lives in a group home, a host home, in

14   Aubrey, Texas.

15     Q     Okay, and how long has he lived there?

16     A     He's been there since I believe about early March of

17   this year.

18     Q     Okay, and just for the record, John is disabled,

19   that's why he's there?

20     A     Yes.

21     Q     All right.  And he needs round-the-clock care?

22     A     24 hour, 7 day a week care.

23     Q     All right.  Has John ever lived with you and your

24   wife?

25     A     Yes, yeah.

1      Q     All right, and when John lived with you and your

2    wife, did Mr. Dunn help you and your wife with John?

3      A     Yes, ma'am.

4      Q     All right.  Now where does Mr. Dunn work?

5      A     He works at ADP Restoration Company.  He owned his

6    own leather company and he works for me as a ranch hand.

7      Q     All right, and him working for you as a ranch hand,

8    is that -- does that include a lot of duties?

9      A     Yes, ma'am, a lot of duties.  It would be ranch hand

10   duties, if you know what that is.  It's anywhere from taking

11   care of horses, feeding horses, mending fences, fixing

12   equipment.  It's a very busy full-time job.

13     Q     All right, and is it fair to say that Mr. Dunn does

14   most of the work?

15     A     Yes, ma'am, he does now, because I'm getting older

16   and I can't work as much as I used to.

17     Q     I understand.  So Mr. Dunn is essential to running

18   the ranch?

19     A     Yes, ma'am.

20     Q     All right.  Before he worked for the restoration

21   company, where did he work before that?

22     A     He worked for Arthur Surveying Company.

23     Q     Okay.

24     A     I think that's out of Flower Mound.

25     Q     All right, and where did he work before that?

1      A      I don't -- he worked for another surveying company.

2    He also worked for Johnson Machinery, based out of Irving.

3      Q      So is it safe to say that Mr. Dunn has always worked?

4      A      Yes, ma'am.

5      Q      All right.  Do you understand the allegations against

6    Mr. Dunn?

7      A      Yes, ma'am.

8      Q      And do you know about social media like Facebook and

9    Twitter?

10      A      I don't know about Twitter.  I do know about

11   Facebook.

12      Q      All right.  And do you understand that there's a

13   difference between a post someone makes and a post someone

14   shares?

15      A      Yes, ma'am.

16      Q      All right.  Have you reviewed some of the posts that

17   are in question?

18      A      Yes, ma'am.

19      Q      And are some of those posts that other people made

20   and Mr. Dunn shared?

21      A      Yes, ma'am.

22      Q      And you are aware what was going on in the world at

23   that time?

24      A      Yes, ma'am.

25      Q      All right.  There were many videos of officers

1    harming people?

2         A    Yes, ma'am.

3         Q    All right.  In one of the videos, it shows what

4    appears to be an older man on the ground and the man bleeding?

5         A    Yes, ma'am.

6         Q    All right, and that video's kind of upsetting?

7         A    Yes, ma'am.

8         Q    All right, and that upset Mr. Dunn?

9         A    Yes, ma'am.

10        Q    All right.  And those types of videos, they upset a

11   lot of people?

12        A    A lot of people.

13        Q    All right.

14        A    Not only on social media, but on national TV.

15        Q    Okay, do you believe that Mr. Dunn would harm

16   someone?

17        A    No, ma'am.

18        Q    Okay, and do you believe that Mr. Dunn would shoot

19   anyone?

20        A    No, ma'am.

21        Q    Okay, now Mr. Dunn had guns in his home.  There were

22   three guns that were taken.  Did you -- do you -- are you aware

23   of that?

24        A    Yes, ma'am.

25        Q    All right, and did Austin own -- Austin.  Did Mr.

 1    Dunn own all of those guns?

 2         A    No, ma'am.

 3         Q    Okay, and which one didn't he own?

 4         A    He didn't own the shotgun, 12 gauge shotgun.

 5         Q    All right, and who is the owner of that gun?

 6         A    I am.  It was a family gun as is all my guns.

 7         Q    Okay, and why did Mr. Dunn have the shotgun?

 8         A    Well, as being a ranch hand, we carry a gun with us

 9    when we go out for various reasons, snakes, coyotes.  We've had

10    instances of bob -- of mountain lions coming on our property,

11    killed four goats a year and a half ago.

12         Q    Okay.

13         A    We lose regularly chickens and cats.  So we keep an

14    eye on bobcats and coyotes.

15         Q    All right, so he wasn't -- Mr. Dunn didn't have the

16    guns to hurt anyone?

17         A    No, ma'am.

18         Q    And, in fact, you may not know this, but did Mr. Dunn

19    even have ammunition for the firearms?

20         A    Not for the shotgun.  He may -- he had some -- well,

21    he had a couple shells for the shotgun, which I -- which were

22    my shells also, but they were buckshot.  I don't know that

23    he -- I don't know if he had any ammunition for the other guns

24    or not.

25         Q    Okay, when Mr. Dunn was arrested, did he obey the

1    officers' commands?

2         A    Yes, ma'am.

3         Q    As far as you know?   Okay.

4         A    Yes, ma'am.

5         Q    And when he was arrested, as far as you know, he

6    opened the door for officers?

7         A    As far as I know, yes, ma'am.

8         Q    All right.   Did Mr. Dunn ever try to run from

9    officers?

10        A    No, ma'am.

11        Q    Did he ever try to resist arrest?

12        A    No, ma'am.

13        Q    All right, so he was very compliant?

14        A    Yes, ma'am.

15        Q    All right.   Now does Mr. Dunn drink heavily?

16        A    No, ma'am.

17        Q    Does Mr. Dunn use drugs?

18        A    No, ma'am.

19        Q    Is Mr. Dunn a violent person?

20        A    No, ma'am.

21        Q    All right.   And if the Court releases Mr. Dunn, would

22    you be willing to let him move into your home like from the

23    guest home to the main house?

24        A    Yes, ma'am.

25        Q    All right, does your home have a landline?

1       A     No, ma'am.

2       Q     Okay, if the Court releases him on a curfew and it

3   wants to call to ensure he's home, would you be willing to

4   install a landline into your house?

5       A     Yes, ma'am.

6       Q     All right.  Are there any firearms in your house?

7       A     Yes, ma'am.

8       Q     Okay, and would you tell us about those firearms?

9       A     As mentioned earlier, they're family-owned firearms

10  that have been passed down from my grandfather, who was a state

11  policeman in New Mexico, to my dad, who passed them on to me.

12      Q     So they're historic heirloom-type firearms?

13      A     Yes, ma'am.

14      Q     Okay, would you be willing to surrender them to the

15  Court if requested, so that Mr. Dunn could be released?

16      A     Yes, ma'am.

17      Q     And does Mr. Dunn have a passport?

18      A     No, ma'am.

19      Q     Okay.  Do you have a passport?

20      A     Yes, ma'am.

21      Q     All right, would you be willing to surrender it if

22  the Court requested so?

23      A     Yes, ma'am.

24      Q     All right.  If the Court releases Mr. Dunn and he

25  breaks the rules, would you notify the Court?

1      A      Yes, ma'am.

2      Q      Okay.   If the Court releases Mr. Dunn and he attempts

3  to flee, would you assist him?

4      A      No, ma'am.

5      Q      Okay, and is there anything else that you would like

6  the Court to know about Mr. Dunn?

7      A      He's my son.   He's lived with us.   He's 30.   He's

8  lived with us for 28 years of those 30 years off and on.   So

9  I've never seen him in a fight.   Never hurt anybody.   He's very

10  compassionate.   He -- in college, he did work for a day hab,

11  daycare place.   Loves little kids.   Wouldn't hurt a flea.

12          MS. ADAMS:   Okay, nothing further, Your Honor.   Pass

13  the witness.

14          THE COURT:   Okay.

15                        CROSS-EXAMINATION

16  BY MS. SMITH:

17      Q      Good morning, Mr. Dunn, just a couple questions.

18      A      Good morning.

19      Q      So you said that your son had lived with you 28 out

20  of the 30 years.   Was he living with you when the charges that

21  occurred in Lubbock happened?   Were you in Lubbock?

22      A      No, ma'am.   He was in -- he was living in Lubbock at

23  that time.

24      Q      Okay, are you aware of what those charges were for?

25      A      Yes, ma'am.

1     Q    Okay, you heard -- when you heard the agent testify,

2  you knew what he had been in trouble for?

3     A    Yes, ma'am.

4     Q    And did you know -- you just said he's not a drug

5  user.  Did you know he failed 20-plus urinalysis tests while he

6  was on probation?

7     A    I knew he had failed some.  I didn't know how many.

8     Q    Okay, so he at least has been a drug user?

9     A    No, ma'am.

10     Q    You think he failed them because he was taking

11  something else or?

12     A    I don't know.

13     Q    Yeah.

14     A    He's not -- I know he's not a drug user.

15     Q    Okay, we understand what --

16     A    If you consider one time smoking a -- pot or joint or

17  whatever it is, if you consider that a drug user, then I guess

18  so, but he's not a -- he is not a drug addict.

19     Q    Okay, well, that's -- those are two different things.

20  I agree with you there.  Those are two different things, but

21  you understand that a urinalysis is what -- is tests -- tests

22  for drug use, right?

23     A    Yes, ma'am, when the last one was a year ago, well,

24  he's had several over the last few years that he's passed.  He

25  hasn't failed in quite some time now.

1      Q     Okay, but he did fail several when he was on

2    probation, that's my point?

3      A     Right.

4      Q     Right?

5      A     As I answered before, yes, ma'am, I know of some.

6      Q     Okay, and so you're not -- you're not on social media

7    or are you on Facebook or?

8      A     I am on Facebook.

9      Q     Okay, that's the only one?

10     A     Yes, ma'am.

11     Q     Okay, and some of those posts, of course, were

12   shared.  Did you see all the posts once Ms. -- once your son

13   was charged with this crime?  Did you see all the posts or?

14     A     I've seen all -- I've looked at all the posts that

15   were in question.

16     Q     Okay.

17     A     Well, in the time frame period, there's a lot of

18   posts that --

19     Q     Oh.

20     A     -- had nothing to do with it, too.

21     Q     Right.  I'm not saying all the Facebook, because that

22   would -- that could be a lot.

23     A     Well, I meant in the time period.

24     Q     Yeah.  Yeah.

25     A     Yes, ma'am, I did look back at it.

1      Q     Yeah.  So a lot of them, he does say things like

2  shoot back, things like that, correct?

3      A     Yes, ma'am.

4      Q     There's several posts like that, right?

5      A     Yes, ma'am.

6            MS. SMITH:  Okay, I'll pass the witness, Your Honor.

7            THE COURT:  Thank you.

8            Anything further for this witness?

9            MS. ADAMS:  Yes, one question, Your Honor.

10                          REDIRECT EXAMINATION

11  BY MS. ADAMS:

12     Q     You may recall, the post where it said shoot back,

13  that was officers were shooting tear gas, correct?

14     A     Yes, ma'am.

15     Q     So shooting back would be shooting tear gas, correct?

16     A     Yes, ma'am.

17           MS. ADAMS:  Okay, no further questions.

18           THE COURT:  Anything further?

19           MS. SMITH:  No, Your Honor, thank you.

20           THE COURT:  All right, thank you.  You may step down.

21           THE WITNESS:  Thank you.

22        (Witness is excused)

23           THE COURT:  Ms. Adams, you may call your next

24  witness.

25           MS. ADAMS:  I would like to call Ms. Judy Dunn, Your

1    Honor.

2                                    JUDY DUNN

3    called as a witness for the Defendant, having been duly sworn

4    testified as follows:

5               THE COURT:  Ms. Dunn, before we begin, if I can ask

6    if you'll just state your full name for the record and spell it

7    as well, please?

8               THE WITNESS:  Judy Elaine Dunn, J-U-D-Y E-L-A-I-N-E

9    D-U-N-N.

10              THE COURT:  Thank you.

11              Ms. Adams, you may proceed.

12              MS. ADAMS:  Thank you.

13                            DIRECT EXAMINATION

14   BY MS. ADAMS:

15       Q    Ms. Dunn, please tell us your age, if you don't mind?

16       A    68.

17       Q    Okay, and what is your current occupation?

18       A    I'm a retired homemaker.

19       Q    And before you were a homemaker, how were you

20   employed?

21       A    I worked as a substitute teacher throughout Denton,

22   ISD, Louisville Independent School District for the entire time

23   that my two children were in kindergarten through 12th grade.

24       Q    Okay, and was that to assist your sons or?

25       A    In my words, it was to help the teachers help my

1   children.

2        Q    I understand.  And before you were a substitute

3   teacher, what did you do?

4        A    I was a flight attendant for Pan American World

5   Airways out of Miami, Florida.

6        Q    Okay, and your job with Pan America (sic), is that

7   how you met your husband?

8        A    Yes, ma'am.

9        Q    Okay, and you currently reside in Bartondale?

10       A    Yes, ma'am.

11       Q    All right, and where did you live before that?

12       A    In Double Oak, Texas, three miles away.

13       Q    All right, and what are the daily activities of

14   taking care of the ranch at your house?

15       A    Well, I deal with most of the inside things.  Taking

16   care of animals.  There's feeding the horses, ranch type of

17   work, tractors, hay, baling.

18       Q    All right.

19       A    Any type of outdoor work that ranch requires.

20       Q    All right, and your husband mentioned that you have

21   another son, who is John (phonetic)?

22       A    Yes, ma'am.

23       Q    All right, and John lives in a host home right now?

24       A    Yes, ma'am.

25       Q    All right, and why is he there?

1       A     Because he has special needs.

2       Q     Okay, and does he require a significant amount of

3    care?

4       A     24/7, yes.

5       Q     And before that, John lived with you and your

6    husband?

7       A     Yes, ma'am.

8       Q     Okay, and when he lived with you and husband, did Mr.

9    Dunn help him or help you with caring for John?

10      A     Yes, there's very few people that we trust to take

11   care of John, because he's nonverbal.  And so, his brother

12   Austin is the one that we trust.

13      Q     I understand.  Okay, and let's see.  Now years ago,

14   Mr. Dunn got into trouble.  You're aware of that?

15      A     Yes, ma'am.

16      Q     All right, and he has completed his probation; is

17   that right?

18      A     Yes, ma'am.

19      Q     All right.  Now when Mr. Dunn was in Lubbock,

20   he -- that's when he was stationed in the Marines?

21      A     Yes, ma'am.

22      Q     All right.  And he was in the Marines for over a

23   year?

24      A     Yes, ma'am.

25      Q     All right, now how is Mr. Dunn currently employed?

1      A      He works for ADP Restoration and he also started his

2    own leather works business on his own.

3      Q      Okay, and before he worked for ADP, where did he

4    work?

5      A      Arthur Surveying.

6      Q      Okay.

7      A      They're out of Flower Mound, I think.

8      Q      Okay, let's see, does Mr. Dunn have a passport?

9      A      No.

10      Q      No, this Mr. Dunn.

11      A      I was going to say, no, he doesn't.

12      Q      Okay, just wanted to be sure.  All right.  All right,

13    now you heard the Prosecutor talk about Mr. Dunn having

14    probation violations for drug use?

15      A      Yes, ma'am.

16      Q      All right, and he was -- he used marijuana?

17      A      That's my understanding, yes.

18      Q      All right, do you know why he was using marijuana?

19      A      Probably because --

20            MS. SMITH:  Your Honor, I'm going to object to

21    speculation.  She doesn't know he was using it, so she can't

22    speculate on why.

23            THE COURT:  I'm going to allow her to answer the

24    question.

25            THE WITNESS:  Well, I wasn't finished.

1    BY MS. ADAMS:

2        Q    It's okay.  You can proceed.

3        A    Okay, Austin had two major back surgeries.  And he

4    had stated that he didn't want to take drugs that would make

5    him addicted, like opiates.

6        Q    Uh-huh.

7        A    And that's why he wouldn't take any other kind of

8    drugs.

9        Q    Okay.  Now if the Court releases Mr. Dunn, would you

10   be willing to be like the third-party custodian to assist and

11   make sure that he got to Court?

12       A    Yes, ma'am.

13       Q    All right, and would you be willing for him to move

14   from the guest house into you all's main home?

15       A    Yes, ma'am.

16       Q    Okay, and you understand that you are aware of the

17   social medial posts, correct?

18       A    Yes, ma'am.

19       Q    All right, and do you believe that Mr. Dunn would

20   harm anyone?

21       A    No.

22       Q    Okay, do you believe that Mr. Dunn would shoot anyone

23   or cause anyone type of -- injure anyone?

24       A    No.

25       Q    And Mr. -- how would you describe Mr. Dunn?

1      A      Compassionate, caring, helpful.

2      Q      Okay.  The -- you all have firearms in your home?

3      A      Yes, ma'am.

4      Q      They're your husband's --

5      A      Yes, ma'am.

6      Q      -- but they're heirloom firearms.  Does Mr. Dunn,

7   your son Mr. Dunn, does Mr. Dunn -- he doesn't abuse alcohol?

8      A      No.

9      Q      Okay, he doesn't abuse drugs?

10     A      No.

11     Q      Okay, is he currently taking any type of medications?

12     A      I'm not aware of any.

13     Q      Okay, have you ever seen Mr. Dunn exhibit violent

14   behavior?

15     A      No.

16     Q      Okay, and is there anything else that you would like

17   the Court to know about Mr. Dunn?

18     A      He is hard working and he has values that his dad and

19   I raised him with.

20     Q      And would you -- you wouldn't help him flee or

21   anything like that?

22     A      No.

23     Q      Okay, and in fact when he was arrested, was he

24   compliant and obeying the officers?

25     A      Yes, uh-huh.

1    Q    Okay, he didn't try to resist arrest or harm anyone?

2    A    No, ma'am.

3         MS. ADAMS:  Okay.  No further questions, Your Honor.

4         MS. SMITH:  No questions, Your Honor.

5         THE COURT:  All right.  Thank you, ma'am.  You may

6    step down.

7         Ms. Adams, do you have any further witnesses to

8    present or evidence to proffer to the Court at this time?

9         (Witness is excused)

10        MS. ADAMS:  I do have evidence for proffer, Your

11   Honor.

12        THE COURT:  If you'll please proceed.

13        MS. ADAMS:  May I approach, Your Honor?

14        THE COURT:  Yes, please.

15        MS. ADAMS:  Your Honor, what I have provided

16   is -- these are from Lubbock County, Texas in regards his

17   previous probation.  There were -- it's just basically a

18   history of all the settings and the events that happened.

19        The second document is the previous probation

20   violation motion.  If you look at the last page, the first and

21   the -- it would be the second page because there's a page for

22   the (indiscernible), they do list his failed urinalysis.  The

23   last one they list was in April of 2019.

24        However, on the previous page, the last failed one

25   was actually in 2018.  And I contacted the Court to verify

 1       that.  So we're -- that's the last of his failed urinalysis was

 2       in 2018.

 3               And Mr. Dunn did complete the probation and was

 4       discharged from the further adjudication probation.  So I saw

 5       in the Pre-trial -- I'm sorry, and the Pre-trial Services

 6       Report, that's what I refer to it as, that has showed a

 7       conviction.

 8               Neither -- he was not convicted of either offense.

 9       He -- both of them were dismissed after he was discharged from

10       probation.

11               THE COURT:  Okay, and I'll just confirm, is there any

12       objection to the proffer?

13               MS. SMITH:  No, Your Honor.

14               THE COURT:  All right, then we'll go ahead and mark.

15       The last exhibit was Defendant's Exhibit 6.  So we will

16       collectively mark these documents, these three documents

17       together as Defendant's Exhibit 7.

18               All right, Ms. Adams, do you have anything further to

19       proffer to the Court at this time?

20          (Defendant's Exhibit 7 admitted into evidence)

21               MS. ADAMS:  No, Your Honor.  If I may have -- if the

22       Court will allow argument?

23               THE COURT:  I will.  In light of the fact that this

24       is not a presumption case, I'll hear from the Government first.

25               MS. SMITH:  Your Honor, this is not a presumption

1    case.  However, there are just too many red flags here.  This

2    isn't a Mr. Dunn has lived with Ms. Decker for a month and a

3    half and been nice and she doesn't know if he smokes marijuana.

4         This is repeated behavior.  The reason he was on

5    probation, although he wasn't convicted of it, both were

6    violent incidents, one with a firearm, one was slashing

7    someone's tires.

8         The probation officer who did -- finally, he did

9    discharge, which we acknowledge from probation said she

10   was -- he said she was the only law enforcement officer he

11   didn't want to kill.

12        And then we have those posts.  And not just one post

13   where he's mad, as many people in America are about what

14   happened to George Floyd.

15        There's several posts.  Shoot those officers.  Any

16   time there's an officer, let's shoot him.  Let's line them up

17   and shoot them.

18        And then, they go to his house and they find three

19   guns and marijuana, which Ms. Decker now says is hemp, but told

20   the officers it was marijuana and also told the officers she

21   got it in Washington and then told me she didn't.

22        So I'm not sure what the truth is there.  The point

23   is there's marijuana in house.  There's guns in the house.

24   He's made several threats.

25        Because of his charges in Lubbock, he was discharged

1   from the military.  He did have, although he did finally

2   successfully complete it, he had many, many violations of his

3   probation.  He's not a good candidate for release.  He kept

4   testing positive and kept testing positive, not just for

5   marijuana, but also for cocaine.

6          And he had other failures to comply.  Failure to

7   report, commission of a new offense, alcohol abuse, other

8   violations in these.

9          Then he gets another chance.  He's extended one more

10  time.  Then he has more violations.  Use of cocaine and

11  opiates.  Tested positive for both of those on the second one.

12  So if you combine all of the circumstances, Your Honor.

13         And there's no doubt that Mr. and Mrs. Dunn are very

14  nice people.  That's not the issue here.

15         The issue is this Mr. Dunn, who has done repeatedly

16  over and over made threats of violence and is a danger to the

17  community.  And we'd ask the Court to detain him.

18         THE COURT:  Thank you.

19         Ms. Adams?

20         MS. ADAMS:  Yes, Your Honor, sorry.  I forgot

21  something.  I forgot I had something.  May I approach, Your

22  Honor?

23         THE COURT:  You may.

24         Any objection?  All right, there being no objection

25  then, this will be admitted as Defendant's Exhibit Number 8.

1          Ms. Adams, you may proceed with argument.

2        (Defendant's Exhibit 8 admitted into evidence)

3          MS. ADAMS:   Thank you, Your Honor.   What I've handed

4    you, what I provided, is the order of the further adjudication

5    from Lubbock County.

6          And if you look at the subsequent pages, there is a

7    laundry list of conditions.   And Lubbock has one of the

8    strictest requirements for probation throughout the state of

9    Texas.   And he complied and he was successfully discharged.

10         The Government brought up that he had a violation for

11   having -- committing a new offense, a new offense that was

12   never charged, that he was never charged with.   And that

13   probation violation was subsequently dismissed.

14         Contrary to the Pre-trial Services Report, Mr. Dunn

15   has no criminal history.   He completed his deferred

16   adjudication for his offense on very, very strict requirements,

17   that even restricted his travel and gave him a curfew and other

18   requirements.

19         And those requirements are similar to what the Court

20   can do here.   The Court can give him a curfew.   The Court can

21   place him on electronic leg monitor.   The Court can even put

22   him on full house arrest.

23         While on probation, Mr. Dunn did have -- did test

24   positive for marijuana and other drugs as I provided to you

25   with the violation.   The last one was in 2018.   So we're at two

1    years since his last positive U.A.

2           In regards to the alleged statements by his probation

3    officer that he's anti-government and that she's the only

4    person that he would trust, that's contrary to everything here.

5    He was in the military.  His dad is a -- was a federal agent

6    for years.

7           And in regards to him -- the post about the boogaloo

8    movement, they're white nationalists, so it can't go hand and

9    hand because he's out here supporting black people and black

10   people's rights.

11          And, oh, sorry, Mr. Dunn and his family are willing

12   to assist him in getting support, complying with the rules.  He

13   does not have a passport.

14          He had other witnesses that were willing to come.

15   They came -- they were coming on Monday, but because it was

16   cancelled.

17          And due to the restrictions with the Court, they did

18   not appear today.  We did -- I -- because there were other

19   cases on the docket and I knew that there were restrictions.

20          In addition, since Monday, there were no Covid-19

21   cases in Collin County Jail.  As of last night, there were

22   three.

23          And I would like the Court to consider that in

24   releasing Mr. Dunn and having him susceptible to contracting

25   Covid when he can be on home confinement or electronic leg

 1   monitoring.

 2        Mr. Dunn is not a flight risk.  He's lived, other

 3   than when he was stationed in Lubbock, he's 30 years old.  He's

 4   been in the Eastern District for 28 years.

 5        Mr. Dunn has always worked.  He, like other

 6   Americans, are working less due to Covid and the current

 7   unemployment rate.

 8        Mr. Dunn still works for his family at their ranch

 9   and assisting their family with maintaining their property, and

10   selling his leather products, and will return to work if the

11   Court allows upon his release.

12        Mr. Dunn, if he was the threat that the Government

13   state that he is, when he was arrested, people who are a threat

14   and anti-government and all these things, they don't get up and

15   open the door for the cops.

16        He got -- he opened the door for the officers and did

17   not attempt to flee, did not attempt to resist arrest.  Even by

18   the agent's own testimony, he was cooperative.  He did not have

19   any type of issues.

20        In fact, the only -- he left his home in his

21   underwear without even clothes.  He -- and I think that most

22   people, of course, would want pants.  He was extremely

23   compliant and helpful.

24        Mr. Dunn is not going to flee.  There are several,

25   several conditions that the Court can impose like as I stated,

1    a curfew, home confinement, electronic leg monitoring.

2         And I am asking that the Court release Mr. Dunn and

3    he also provide U.A., urinalysis testing, to the Court if it

4    requires that.

5         Mr. Dunn is -- and his family are willing to meet any

6    set of conditions that the Court provides for his release.

7         THE COURT:  Ms. Adams, I'd like an opportunity

8    obviously to look at the documents you've proffered, but I do

9    have a question.

10        MS. ADAMS:  Uh-huh.

11        THE COURT:  In the order of deferred adjudication

12   you've provided to the Court, it indicates that he was

13   being -- when he was on probation, he was remaining in Denton

14   County and was being supervised there.

15        So during each of the urinalysis that he's alleged to

16   have failed in 2016, '17, and '18, was he residing with his

17   parents at that time?

18        MS. ADAMS:  Yes.

19        THE COURT:  All right.  Anything further from the

20   Government in argument at this time?

21        MS. SMITH:  No, Your Honor.

22        THE COURT:  All right, I am going to take the matter

23   under advisement.  I need an opportunity obviously to review

24   each of the reports, Ms. Adams, that you proffered to the

25   Court.

1             As well, my understanding is that as far as

2   information that was provided to Pre-trial Services for running

3   of criminal histories, we only have one of the residence that

4   is at the ranch property where you're requesting that he be,

5   you know, permitted to reside.

6             MS. ADAMS:  Uh-huh.

7             THE COURT:  And so, I'm going to ask if you can

8   provide information to Pre-trial Services, so that the criminal

9   histories can be obtained for all persons who will be residing

10  at the property that you're requesting Mr. Dunn be released to.

11            After I receive that information from Pre-trial

12  Services and have an opportunity to review the evidence you

13  proffered to the Court, following that, I'll make my

14  determination.

15            If it's necessary, we'll reconvene for entry of

16  conditions or I'll otherwise enter an order of detention.

17            Is there anything further from the Government at this

18  time?

19            MS. SMITH:  No, Your Honor, thank you.

20            THE COURT:  Ms. Adams, anything further from you?

21            MS. ADAMS:  No, but I do have a question.

22            THE COURT:  You may ask a question.

23            MS. ADAMS:  You said we may reconvene.  So is it okay

24  for me to leave Court or should I stay here?

25            THE COURT:  No, I have to get Pre-trial.  You're

1    going to need to get that information and Pre-trial will have

2    run those histories.

3              And I can't guarantee you how long it's going to take

4    for them to run that or get the information to me, so that I

5    can review it.

6              So I don't anticipate being able to make a

7    determination today, because I'll have to get that information

8    from Pre-trial before I can do it.  So, yes, we're going to

9    adjourn Court at this time.

10             And if after I receive that information from

11   Pre-trial, I determine to release your client, we'll reconvene

12   for the purposes of entering conditions.

13             MS. ADAMS:  Okay.

14             THE COURT:  All right?

15             MS. ADAMS:  Thank you.

16             THE COURT:  Any other questions, Ms. Adams?

17             MS. ADAMS:  No, Your Honor.

18             THE COURT:  All right, so Mr. Dunn, I want to make

19   sure that you understand what's going on, all right?  Your

20   lawyer's given me a lot of information at this time.  And so,

21   what I'm going to do is I'm going to review all of it.

22             And in addition to that, I've asked her to provide

23   some additional information to Pre-trial Services, so I have a

24   better understanding of the persons that she's asking for you

25   to go home and reside with.

1           Once I get that information, I'll make a decision.

2    Do you have any questions, sir?

3           THE DEFENDANT:  I don't.

4           THE COURT:  All right, so at this time, you're going

5    to go back with the Marshal Service and you will go back to

6    Collin County.

7           And then as soon as I've made my determination, your

8    lawyer will be advised and she'll be able to speak with you

9    about what's going to happen from there, okay?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  All right, if there's nothing further

12    then, we will be adjourned.  Thank you, everyone.

13           MS. ADAMS:  Thank you.

14           MS. SMITH:  Thank you.

15        (Proceedings concluded at 11:56 a.m.)

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4              I, Chris Hwang, court approved transcriber, certify

5      that the foregoing is a correct transcript from the official

6      electronic sound recording of the proceedings in the above-

7      entitled matter.

8

9

10

11

12

13      _____          June 25, 2020

14      Chris Hwang                   Date

15      Transcriber

16

17

18

19

20

21

22

23

24

25