1                    UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

3    UNITED STATES OF AMERICA,
                                      Case No. 4:20-cr-00142-SDJ-
4              Plaintiff,             KPJ-1

5    v.                               Sherman, Texas
                                      June 30, 2020
6    DANIEL AUSTIN DUNN, also known   8:34 a.m.
     as Whiskey Tango10, also known
7    as Osama bin Drinkin, also
     known as SirAustinOfDunn,
8
               Defendant.
9

10             TRANSCRIPT OF DETENTION HEARING (CONTINUED)
              BEFORE THE HONORABLE CHRISTINE A. NOWAK
11                  UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:
     For the Plaintiff:          Christopher Eason, Esquire
13                               U.S. Attorney's Office
                                 101 E. Park Boulevard
14                               Suite 500
                                 Plano, TX 75074
15
     For the Defendant:          Temani Adams, Esquire
16                               Temani Adams, PLLC
                                 3824 Cedar Springs Road #179
17                               Dallas, TX 75219

18   Also Appearing:            Ms. Judy Dunn (Mother)
                                 Mr. Rick Dunn (Father)
19

20   Court Recorder/Clerk:       K. Lee

21   Transcription Service:      Chris Hwang
                                 Abba Reporting
22                               PO Box 223282
                                 Chantilly, Virginia  20153
23                               (518) 302-6772

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1                             **<u>INDEX</u>**

2                                                    <u>Page</u>

Court's Ruling                          72

| WITNESSES FOR PLAINTIFF | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| Jeffrey Cotner | 4 | 36 | 44 | |

| WITNESSES FOR DEFENDANT | | | | |
|---|---|---|---|---|
| Bailey Decker | 46 | 49 | 63 | |

| EXHIBITS | <u>OFFERED</u> | <u>RECD</u> |
|---|---|---|
| Plaintiff's/Government's B | 7 | 7 |
| Plaintiff's/Government's C | 9 | 9 |
| Defendant's 1 | 10 | 10 |

1              (Call to order at 8:34 a.m.)

2                   THE COURT:  At this time, the Court will call cause

3       number 420CR142, the United States of America v. Daniel Austin

4       Dunn.  The Court convened for a detention hearing in this

5       matter previously on June the 18th.

6                   The Court took the matter under advisement at the

7       conclusion of the hearing.  And subsequent thereto, the

8       Government asked for an opportunity to submit additional

9       evidence for the Court to consider prior to making its

10      determination.

11                  The Court has advised both the Government and Defense

12      that it will consider any additional evidence that either of

13      the parties care to offer.  And we are convened here for the

14      purpose of that today.

15                  We will begin with the Government.  Mr. Eason, if you

16      have additional witnesses or evidence to proffer to the Court,

17      you may do so at this time.

18                  MR. EASON:  Yes, Your Honor.  The Government calls

19      Special Agent Jeff Cotner back to the stand.

20                  THE COURT:  Thank you.

21                  Agent Cotner, if you'll please come forward to be

22      sworn.

23                          JEFFREY COTNER

24      called as a witness for the Plaintiff/Government, having been

25      duly sworn testified as follows:

1      THE COURT:  Agent Cotner, I know you did this at the

2   last hearing, but just for purposes of today's record as well,

3   if you could go ahead and please state your full name, as well

4   as spell it?

5      THE WITNESS:  Sure.  Jeffrey Brian Cotner,

6   J-E-F-F-R-E-Y B-R-I-A-N C-O-T-N-E-R.

7      THE COURT:  Thank you.

8      Mr. Eason, you may proceed.

9      MR. EASON:  Yes, Your Honor.

10                    DIRECT EXAMINATION

11   BY MR. EASON:

12      Q    Special Agent Cotner, do you have Government's

13   Exhibits A, B, and C there with you?

14      A    Yes, sir.

15      Q    Have you had a chance to review Government's Exhibits

16   A, B, and C prior to coming to Court today?

17      A    Yes.

18      Q    And those are the same exhibits referenced in the

19   Government's motion to re-open detention hearing?

20      A    Yes.

21      MR. EASON:  Your Honor, move to admit Government's

22   Exhibit A, B, and C and request permission to approach the

23   bench to pass you a copy as well?

24      THE COURT:  Has Ms. Adams had an opportunity to

25   review each of those exhibits?

1            MR. EASON:  Your Honor, these exhibits were emailed

2    to Ms. Adams last week and I also provided her a hard copy this

3    morning.

4            MS. ADAMS:  No.

5            THE COURT:  Okay.

6            MS. ADAMS:  Okay, no, these documents were not

7    emailed to me last week.  I in fact -- he provided this to me

8    this morning.  Last week, what I was provided with was one copy

9    of the 302 that he's trying to admit, which is listed as

10   Exhibit B.

11           And I believe I received the military records from

12   Mr. Dunn.  Other than that, I did not receive anything else.

13   So I --

14           THE COURT:  Okay, Ms. Adams, do you require

15   additional opportunity to review any of the records to

16   determine anything that you'd like to make -- any statements

17   you'd like to make to the Court regarding those?

18           MS. ADAMS:  Well, Your Honor, I -- my position is

19   that, one, I do need additional time.  I just received it.  And

20   also, this information was in their possession prior to the

21   detention hearing, so this is not new information.

22           THE COURT:  We've already discussed that particular

23   issue and the Court, because I've taken the matter under

24   advisement, haven't made a decision.  I'm going to hear

25   additional evidence from both sides, both the Government and

1    Defense.

2           And so, for that reason, I'll hear any witnesses or

3    evidence that you have to proffer to the Court as well.  I feel

4    that it's in all of our best interests for the Court to

5    consider all information in making a decision.

6           So I'm going to receive additional evidence.  The

7    question is whether or not you want some additional time to

8    review those records before we make a determination about A, B,

9    and C.

10          MS. ADAMS:  Yes, Your Honor.

11          THE COURT:  All right, please be seated and you may

12   have that opportunity.

13          MR. EASON:  Permission to approach the Court while

14   she's reviewing that, to hand the Court Government's Exhibits

15   A, B, and C?

16          THE COURT:  Let's wait until she has an opportunity

17   --

18          MR. EASON:  Okay.

19          THE COURT:  -- to see those and then you may.

20       (Pause)

21          MS. ADAMS:  And Your Honor, for the record, I have no

22   objection to Exhibit B, because that was emailed me.

23          THE COURT:  Okay.  Then in light of that, Mr. Eason,

24   if you have a copy of Exhibit B and you want to bring that

25   forward?

1    And I will just remind everybody that in light of the

2    fact that detention hearings are informal proceedings, the

3    evidence that's presented is not governed by the Federal Rules

4    of Evidence, but I will consider any objections that don't

5    relate to the Federal Rules of Evidence.

6    Thank you.

7    All right, and there being no objection to Exhibit B,

8    Government's Exhibit Number B shall be admitted.

9    (Plaintiff's/Government's Exhibit B admitted into

10    evidence)

11    (ringing)

12    OPERATOR:  Welcome to AT&T Teleconference Service.

13    Please your access code, followed by the # sign.  To join the

14    conference as the host, press *, otherwise press #.

15    Please enter your host password followed by the #

16    sign.  Please enter the security code followed by the #.  There

17    are one participants on the call, including you.  You're

18    joining your conference as the host.  For a menu of available

19    commands, press *, #.

20    THE COURT:  We have a Pre-trial Services Officer,

21    who's joining us on the phone, the one who prepared the report

22    related to the detention hearing.

23    MS. ADAMS:  Okay, I was just confused, like what's

24    going on.  So no objection to A.

25    THE COURT:  Uh-huh.

8

```
 1          MS. ADAMS:  C, I -- this looks like --

 2      (Beep)

 3          THE COURT:  That's -- it's just her beeping on to the

 4   line.  That's all it is is Pre-trial Services.

 5          MS. ADAMS:  This looks like a excerpt from records

 6   that I did receive.  I'm not certain if these are,

 7   (indiscernible) 114 pages.  It's obviously not.

 8          THE COURT:  Do you want to supplement and provide the

 9   full 114 pages?

10          MS. ADAMS:  I can print it now, but I don't know

11   (indiscernible).

12          THE COURT:  I will give you the time that you need to

13   look at it.  I don't want you to feel like you haven't had an

14   opportunity to review.  I'm not rushing you.

15          MS. ADAMS:  No, I understand.  I just wanted to make

16   it clear I believe it is an excerpt from the military records.

17          THE COURT:  And so, I just want confirm, do you want

18   to submit the full records or are you comfortable with the

19   excerpt that Mr. Eason is attempting to submit?

20          MS. ADAMS:  I have a copy of the full record.  I have

21   three.  I'll send you copy.

22          THE COURT:  Okay.  So there being no objection to

23   Exhibit C, Exhibit C, Government's Exhibit C shall be admitted.

24          At least as to the discuss Government's A, Ms. Adams

25   has advised that she believes that record is incomplete and
```

1    does not contain Mr. Dunn's full military history.  And as a

2    result, she's requested to proffer the full record.

3              Mr. Eason, is there any objection to Ms. Adams

4    proffering the full military record?

5         (Plaintiff's/Government's Exhibit C admitted into

6    evidence)

7              MR. EASON:  There's no objection to the full record.

8    We would like to see what exactly she has.  There are things in

9    there such as dental records, which we didn't think was

10   relevant for the Court's consideration that we did withdraw to

11   save the Court some time.  We have no objection if she wants to

12   introduce those.

13             THE COURT:  Okay.

14             MS. ADAMS:  And as far as Exhibit A, I'm -- you can

15   (indiscernible).

16             THE COURT:  So do me a favor.  Hand Mr. Eason the

17   full record that you'd like to submit, so he has a chance to at

18   least take an opportunity to review that.

19             And then, assuming he sees no problems with it, what

20   we'll do is we'll admit together Government's Exhibit A, as

21   well as Defense Exhibit 1, and we'll put those together.

22             MR. EASON:  Your Honor, permission for the witness to

23   step down for one second to look at this with me?

24             THE COURT:  You may.

25             MR. EASON:  Okay.

1        (Pause)

2              MR. EASON:  Your Honor, we have no objection if the

3        Defense wants to introduce this.  We would note for the record,

4        though, Mr. Jackson (phonetic) did email the Defendant this.  I

5        emailed the Defendant this.

6              This is exactly our document in the exact order,

7        including the duplicates are provided to the Defense counsel

8        prior to this hearing today.  We have no objection if she wants

9        to enter this whole one.

10             THE COURT:  Go ahead and press forward then.  If you

11       can proffer to the Court, Mr. Eason, a copy of Government's A

12       and C.  And we will take the full military history and have it

13       marked as Defendant's Exhibit Number 1.

14         (Defendant's Exhibit 1 admitted into evidence)

15             MR. EASON:  Wish to approach, Your Honor?

16             THE COURT:  Yes, thank you, Mr. Eason.

17             Thank you, Ms. Adams, you can come forward as well.

18             Can you mark hers for her because it doesn't have a

19       sticker yet?  Uh-huh, that's Defendant's 1.

20             THE COURT:  All right, Mr. Eason, you may proceed.

21             MR. EASON:  Thank you, Your Honor.

22       BY MR. EASON:

23         Q    Now Special Agent Cotner, you had a chance to review

24       these exhibits prior to coming to Court today; is that correct?

25         A    Yes.

1      Q     Okay, Exhibit A, the police reports, where did you

2   obtain those?

3      A     They were obtained from the Lubbock Police

4   Department.

5      Q     Okay, and Exhibit B is a 302 of an interview with

6   Bailey Decker; is that correct?

7      A     Yes.

8      Q     That's produced by your office?

9      A     Yes.

10     Q     Okay, and then Exhibit C, where did you obtain

11   Exhibit C?

12     A     I obtained these records from the military operation

13   support team.  That is attached to our National Joint Terrorism

14   Task Force.

15     Q     Okay, and now with respect to Exhibit C, let me take

16   you back to your testimony you provided to the Court last week.

17        In there, you had stated that you obtained his military

18   records, you reviewed them.  In 2010, he signed a eight-year

19   commitment with the U.S. Marine Corps Reserve, is that true?

20     A     Yes.

21     Q     Okay, and then you testified that in December of 2012

22   after he was arrested by the Lubbock Police Department, that's

23   Mr. Dunn; is that correct?

24     A     Yes.

25     Q     You wrote or you said his chain of command

1     recommended that he be discharged and that he receive other

2     than honorable discharge; is that true?

3          A     Yes.

4          Q     Based on the records, that's true, is that right?

5          A     Yes.

6          Q     Okay, then you went on to say, however, he ultimately

7     did receive an honorable discharge.  Is that true as you sit

8     here today?

9          A     That is what I said, but the other -- he received an

10    honorable discharge for his active duty time, which was only

11    his training for like basic training and aircraft technician

12    training.

13         But the other than honorable was related to his reserve

14    status, not his active duty status.  And the documents here

15    support that if you look at the dates.

16         Q     Okay, so did he ultimately receive an honorable

17    discharge for his overall service in the United States Marine

18    Corps?

19         A     No.

20         Q     What characterization did he receive, if you know

21    that?

22         A     My understanding from talking to a NCIS special

23    agent, who reviewed these records, is that he received a other

24    than honorable discharge for his Reserve service.

25         Q     Okay.  Now that's his service with the Marine Corps;

1    is that correct, sir?

2         A    Yes.

3         Q    Okay, so if we can -- you have a copy of the exhibits

4    up there with you; is that right?

5         A    Yes.

6              MR. EASON:  Okay, and I don't have the projector,

7    Judge, but I would like to point out a couple sheets of paper

8    here for the Court's benefit?

9              THE COURT:  Certainly.

10   BY MR. EASON:

11        Q    On the first substantive page of Exhibit C is a DD

12   Form 214; is that correct, sir?

13        A    Yes.

14        Q    Okay, and in block 7 alpha, it says place of entry

15   into active duty, it says Dallas MEPS, M-E-P-S.  That's

16   Military Entrance Processing Station; is that correct?

17        A    Yes.

18        Q    And if you look down here in block 11, it says that

19   his job, his primary specialty, is to be an aircraft ordinance

20   technician, but he has zero years, zero months, and zero days

21   for this period of service; is that correct?

22        A    Yes.

23        Q    Okay, and then if you'll -- on block 12, it says the

24   date he entered active duty of this period was July 12th, 2010.

25   Do you see that, sir?

1        A    Yes.

2        Q    Okay, and then he was on active duty until 2011,

3   March 17th; is that correct?

4        A    Yes.

5        Q    So approximately, what is that, six months, seven

6   months, eight months, somewhere in there?

7        A    Yeah.

8        Q    Less than a year; is that right?

9        A    Correct.

10       Q    Okay, so your understanding he was doing school, his

11   basic training and his primary specialty school training during

12   this time?

13       A    Yes.

14       Q    If you look at block 18, it then directs him what

15   he's going to be doing as a member of the Marine Corps Reserve;

16   is that correct?

17       A    Yes.

18       Q    Then here at the bottom of block 23, type of

19   separation is release from inactive duty training IEDT; is that

20   correct?

21       A    Yes.

22       Q    And it says completion of required active service

23   paragraph 28 and it says honorable in paragraph 24; is that

24   correct?

25       A    Correct.

1          Q     Okay, we're going to come back to some of these in

2     just a second here.  If you go to page 3 now of the exhibits.

3               MR. EASON:  Judge, I apologize, these are not marked

4     at the bottom.

5               THE COURT:  Are you referencing the one that is dated

6     December 4th of 2012?

7               MR. EASON:  Yes, ma'am.

8               THE COURT:  Okay.

9     BY MR. EASON:

10         Q     It's from the Commanding General 4th Marine Logistics

11    Group and it's to the Commandant of the Marine Corps.  Do you

12    see that there, Special Agent Cotner?

13         A     Yes.

14         Q     It says recommendation for administrative discharge

15    of Lance Corporal Daniel A. Dunn, United States Marine Corps

16    Reserve.  And then down in paragraph 2(a), it says

17    characterization of service, other than honorable.  Do you see

18    that?

19         A     Yes.

20         Q     Okay, and the separation code is HKQ1 in block C,

21    paragraph (c), rather for misconduct.  Do you see that?

22         A     Yes.

23         Q     Okay, so HKQ1, we'll come back to that in just a

24    second.  If you go to the next page, please, Special Agent

25    Cotner?

1          And these documents that are follow are the packet related

2     to that administrative discharge for an under other than

3     honorable conditions discharge; is that correct?

4          A    Yes.

5          Q    Okay.  The next page is from the Staff Judge

6     Advocate.  That's the lawyer for the 4th Marine Logistics

7     Group; is that correct?

8          A    Correct.

9          Q    Okay, and it's to the commanding general and it's a

10    recommendation for administrative discharge of Lance Corporal

11    Dunn.

12         And again in block 2 in paragraph 2, recommended basis for

13    discharge, misconduct or commission of a serious offense.  And

14    the recommended characterization discharge in paragraph 3 is

15    other than honorable; is that correct, sir?

16         A    Yes.

17         Q    Okay, now here in block 5, it says SNM has not been

18    mobilized or deployed and is exempt from the required medical

19    screening for PTSD or TBI; is that correct, sir?

20         A    Correct.

21         Q    Okay, was that also consistent with the FBI

22    interviews of Mr. Dunn's father?

23         A    Yes.

24         Q    Specifically that Mr. Dunn's father told you he had

25    not -- not you, but told an FBI agent he had not been deployed;

1    is that right?

2        A    That's correct.

3        Q    And then, it says here recommend that Mr. Dunn, Lance

4    Corporal Dunn be separated from the Marine Corps with an other

5    than honorable characterization of service, correct?

6        A    Correct.

7        Q    Okay.  If we go to the next page, this document's

8    dated 2 October 2012.  And it's from the commanding officer to

9    the commanding general.  Is that correct, sir?

10       A    Yes.

11       Q    Okay, it says essentially the same things here in

12   paragraph 3 that he has not deployed or participated in a

13   combat operation during his service; is that correct?

14       A    Yes.

15       Q    Okay, and paragraph 5 says he has no combat service

16   or deployment; is that correct?

17       A    Correct.

18       Q    If you go to the next page, this is actually the

19   document that was sent to Lance Corporal Dunn, is that correct?

20       A    Yes.

21       Q    It's from the commanding officer of says Motor

22   Transport Company, 6 Motor Transport Battalion to Lance

23   Corporal Daniel A. Dunn, the United States Marine Corps

24   Reserve.

25        And its subject is notification of separation of

1    proceedings.  And if you look there at paragraph 2, it says the

2    least favorable characterization of service which you may

3    receive is other than honorable; is that correct?

4         A    Yes.

5         Q    And that's what he was recommended for; is that

6    right?

7         A    Correct.

8         Q    Okay, and then we had that code of HKQ1 earlier.  Is

9    that right, sir?

10        A    Correct, for misconduct.

11        Q    Yes, and then, it goes on the next couple pages to

12   list out his rights that he has as part of the administrative

13   separation process; is that right, sir?

14        A    Yes.

15        Q    Okay, if we skip forward two pages here or three

16   pages, there's actually a memo from Lance Corporal Daniel A.

17   Dunn to his commanding officer signed by Quarterly Lance

18   Corporal Dunn on 16 October at 10:30 time in the morning; is

19   that right?

20        A    Yes.

21        Q    And there's further documents in here with Lance

22   Corporal Dunn's initials on there understanding his rights; is

23   that correct sir, acknowledging his rights?

24        A    Correct.

25             MR. EASON:  Okay, let's go to the back.  At the very

 1    back of the exhibit, there's eight pages, Your Honor.  We're

 2    going to page 1 of those eight pages.

 3            And at the top of that page, it says individual

 4    separation information, page 1 of 7.  And I apologize for not

 5    having these marked at the bottom.

 6            THE COURT:  I'm there.

 7    BY MR. EASON:

 8        Q    Okay, so Special Agent Cotner, at the very top of the

 9    left-hand corner, it says pay entry date 2010, July 12th; is

10    that right?

11        A    Yes.

12        Q    So when we flip back to the first page and we look at

13    the date entered, active duty this period for a school, it's

14    2010, 7/12, July 12th; is that right?

15        A    Yes.

16        Q    Okay, so that matches up, right?

17        A    Correct.

18        Q    So this document we're looking at, the back, this is

19    individual separation information for Mr. Dunn's whole military

20    service; is that right?

21        A    That's right.

22        Q    Okay.  Now it says original entry date, do you know

23    that's when he took the oath.  Do you know whether that's true

24    or not?

25        A    I don't know if that's the day he took --

 1          Q     That's fine.  You don't need to worry about that.

 2          A     Yeah.

 3          Q     Look at the discharge date, December 12th or December

 4     5th, 2012.  Do you see that?

 5          A     Yes.

 6          Q     Okay, that matches up with the documents from the

 7     commanding general; is that correct?

 8          A     Correct.

 9          Q     And then, the separation code HKQ1, that's for

10     misconduct or commission of a serious offense; is that right?

11          A     Yes.

12          Q     Okay, that's the same code that's referenced in the

13     discharge paperwork for an under other than honorable

14     conditions discharge; is that right?

15          A     Correct.

16          Q     All right, here at the bottom right, it says combat

17     service code, last combat tour heroism, and there's -- it's

18     blank.  There's nothing there, is that right?

19          A      Correct.  And if we skip forward three pages here, on

20     the bottom, there's some codes and schools and specialties and

21     ST and dates.  Do you see that, sir?

22          A     Yes.

23          Q     Okay, and it just lists some schools.  In fact, some

24     basic schools:  Marine combat training, recruit training, and

25     aircraft ordinance technician.  That was to be his primary job;

1    is that right?

2         A    Yes.

3         Q    That's all he has?  He has nothing else; is that

4    correct, sir?

5         A    Correct.

6         Q    Okay, so the characterization for his service to the

7    United States Marine Corps for a total of approximately two

8    years is under other than honorable conditions of discharge

9    characterization; is that right?

10        A    Based on his paperwork and based on my conversation

11   with the NCIS special agent, that is correct.

12        Q    Okay, and in your testimony last week, you actually

13   testified that you talked to someone, a female in the National

14   Joint Terrorism Task Force, but she was actually from the Army;

15   is that right?

16        A    I'm not sure about her, but the first individual I

17   talked to was from Army CID.

18        Q    Okay, this -- but the person you talked to now that

19   clued you in on this paperwork here was from the Navy; is that

20   right?

21        A    That's correct.

22        Q    Okay.  Let's go ahead and shift gears and let's talk

23   his Exhibit A, a copy of Exhibit A there.

24        A    Yeah.

25        Q    Do you have it in front of you, sir?

1      A     Yes.

2      Q     Okay, there's essentially two reports in here, one

3   for September 1st, 2012, one for September 23rd, 2012, and then

4   some other loose paperwork as well; is that right?

5      A     Correct.

6      Q     Okay, if you could please just briefly summarize for

7   the Court what this Exhibit A is discussing on September 1st

8   and what it's discussing September 23rd?

9      A     The September 1st report discusses first arrest by

10  the Lubbock Police Department, where he was arrested for public

11  intoxication and discharging of a firearm in a municipality.

12     Q     And the second police report?

13     A     During this time, he -- I don't know how much detail

14  you want me to go into, but he discharged his weapon.  The

15  officers on scene felt that he had staged the scene to try to

16  win back his girlfriend and that the series of events do not

17  match up with what Mr. Dunn presented to the officers.

18     Q     Okay, the officers in this report talk about how they

19  believe Mr. Dunn was lying to them; is that right?

20     A     That's correct.

21     Q     Okay.  So if you go to, let's see here, page 4 of

22  this exhibit?

23     A     Okay.

24     Q     At the top of the page, it says Lubbock Police

25  Department, 12 Tac 30853.  And it has a phone type cell, then a

1    phone number, and a date September 1st, 2012.  And then,

2    halfway down the page, it starts with narrative.  Do you see

3    that, sir?

4         A    Yes.

5         Q    Okay, and then, in the first full paragraph, it says

6    upon arrival, Officer Anderson was on the scene and had secured

7    A-1's Black Taurus pistol.  That's similar to the gun that you

8    retrieved from his residence pursuant to his search warrant; is

9    that right?

10        A    Yes.

11        Q    And if you go to the next page, and it just

12   described, if you look at the third full paragraph down, it

13   just describes his demeanor with respect to law enforcement.

14   He's -- Mr. Dunn's demanding certain things.  He's not

15   cooperating.  Is that correct?

16        A    Correct.

17        Q    Okay, and if you go to the third full paragraph from

18   the bottom of the page, this is where he presents a story to

19   law enforcement about somebody coming to his house with a

20   weapon, knocking on the door, and firing in the door at him,

21   and him running and getting his weapon to fire back; is that

22   correct?

23        A    That's correct.

24        Q    If we could skip forward one, two, three -- five

25   pages forward?

1        A     Okay.

2        Q     Or four pages forward, rather.  And it's the

3   beginning of a new report.  And the report date is September

4   1st, 2012.  The reporting officer here is Hester (phonetic),

5   comma, Grady (phonetic) and then in parentheticals, Ross

6   (phonetic).  Do you see that there, sir?

7        A     Yes.

8        Q     Okay.  This is a -- roughly a two-page report here;

9   is that right?

10       A     Yes.

11       Q     Also, dated September 1st, 2012.  And if you go to

12  the second page of the report, and for the Court's

13  consideration, if you start looking at the first full paragraph

14  or second full paragraph, I did see a bullet hole in the foyer

15  wall?

16       A     Correct.

17       Q     And then, you go down the next three paragraphs and

18  read these, this is where the officer's talking about Mr. Dunn,

19  in his opinion, staging a scene; is that correct?

20       A     Yes, the officer stated that it appeared the shot

21  came from inside of Mr. Dunn's residence and not from the

22  outside the way that Mr. Dunn described.

23       He also says that the front wooden door and the outside

24  glass door would not open wide enough for the bullet to pass

25  unimpeded.

1    So he believed that if the shot was fired from the

2  outside, it would have had to pass through one of those doors.

3  And there was no bullet hole in those doors.

4    Q    Okay, and if we go to -- please go forward one more

5  page here, actually two more pages here, it's at the very top

6  of the page, it's report date September 13th, 2012.  And the

7  member here is Steen (phonetic), comma, Jeremy Michael

8  (phonetic) there at the top; is that right?

9    A    Yes.

10    Q    Okay, I look at the bottom of this page, it's

11  September 3rd, 2012.  So just two days later.  The officer had

12  received multiple voicemails in his phone from Rick Dunn,

13  Daniel Dunn, and Barry (phonetic) -- or Rick Dunn, period, is

14  that right?

15    A    Correct.

16    Q    And who was that?

17    A    That is Mr. Dunn's father.

18    Q    Okay, and the next page here in the first full

19  paragraph under the heading September 6, 2012?

20    A    Yes.

21    Q    What is this detail?

22    A    This states that the officer received a phone call

23  from Mr. Dunn, who was upset about his son being arrested.  He

24  felt like he was wrongfully arrested.

25    It says that Rick Dunn threatened internal investigations,

1    as well as military investigations, and Congressional hearings.

2    And the officer felt like Rick Dunn was using his employment

3    with a federal agency to intimidate him.

4         Q    Now if we skip forward now multiple pages, go to the

5    page that's December 23rd, 2012.  It's about ten full pages

6    forward.  At the bottom of the page, it says page 1 of 6.

7         A    You said 10 to 12 pages forward?

8         Q    Yes, it's titled Lubbock Police Department and it has

9    the spreadsheet on the front.  At the bottom of it, it says

10   page 1 of 6.  And the top right, it says 9/23/2012.

11        A    Tell me again what that starts with?

12        Q    It says report date 9/23/2012, report incident type

13   weapons, the member or department ID number is Freeman

14   (phonetic), comma, Adam Garrett (phonetic).

15        And then, there's a table on the front page here, Special

16   Agent Cotner, under administrative information.  At the bottom

17   right, it says page 1 of 6.

18        A    Yes, I'm with you.

19        Q    Okay, and this is the beginning of the report for

20   September 23rd, 2012 for Mr. Dunn's unlawful actions then; is

21   that right?

22        A    Yes.

23        Q    Okay.  And if you go to the next page here, the

24   summary narrative, it says A-1, that's referencing the

25   Defendant; is that right?

1       A    Yes.

2       Q    It says damage to V-1, that's victim 1's, property in

3    retaliation for a previous case.  A-1 placed V-2 and V-3 in

4    fear for their lives and property on more than one occasion.

5    A-1, that's the Defendant, right?

6       A    Yes.

7       Q    Was in possession of an illegal knife.  And A (sic)

8    was intoxicated in a public place and a danger to themselves

9    and others.  It's all true and correct, sir?

10      A    Correct.

11      Q    And if we skip forward three pages here, and this is

12   at the top of this page, it says Lubbock Police Department, 12

13   Tac, and when I says Tac, I mean dash, 33878.

14      Underneath that, it says vehicle.  And then, there's a

15   modus operandi, then narrative.  Do you see that sir?  At the

16   bottom of it, it says page 5 of 6.

17      A    Yes.

18      Q    So if you look at the third paragraph here, Officer

19   Stamps (phonetic) advised he located A-1.  That's the

20   Defendant, right?

21      A    Officer Stamps advised he located A-1 walking.  Is

22   that where you are?

23      Q    That's right.  Walking away from the front door of

24   Victim 1's residence, Officer Stamps advised A-1 had a knife on

25   his person, which Officer Stamps secured until his -- till my

1    arrival.  It says see Officer Stamp's related supplemental

2    report.

3         And then, it goes on to talk about this reporting

4    officer's observations; is that correct?

5         A    Correct.

6         Q    Okay, and if you look at the middle of the next

7    paragraph, it says that the reported problem have -- possibly

8    having a firearm on him.

9         In my previous dealing with A-1, the Defendant, having

10   numerous firearms, myself and other officers on the scene

11   checked the Defendant's vehicle for any firearms.

12        We located a camouflaged .270 caliber rifle with three

13   rounds in the magazine and one in the chamber.  That means that

14   there's one ready to go, ready to be fired; is that right?

15        A    Yes.

16        Q    And a gun mount in the back window of A-1's vehicle.

17   We also located a black .9 millimeter semi-automatic carbine

18   with 15 rounds and an extended magazine in one round and the

19   chamber again ready to go; is that right?

20        A    Correct.

21        Q    All right, he unloaded the rifle, secured them and

22   ammunition in the back seat of Officer Jones patrol vehicle; is

23   that correct?

24        A    Correct.

25        Q    And then, he got the knife and it had partial

1    serrated edges on both knives sharpened; is that correct?

2        A    Yes, that's when he was arrested for unlawful

3    carrying of a weapon.

4        Q    And that was a knife; is that right, sir?

5        A    Correct.

6        Q    And if you go to the next page, one, two, three

7    paragraphs down, those were the officer's observations of the

8    tires that had appeared to have been slashed by the knife, is

9    that correct?

10       A    Correct.

11       Q    Later determined there were five puncture marks in

12   the tire; is that right?  That's near the bottom of that third

13   paragraph, sir.

14       A    Correct.

15       Q    Okay, and then at the bottom and next paragraph, last

16   sentence, I determined the Defendant was intoxicated, was

17   located in a public place, and was a danger to himself and

18   others; is that correct?

19       A    Correct.

20       Q    Okay.  If you please go to Government's Exhibit B,

21   just going to shift gears and talk about that for a second.

22   This is a two-page document; is that correct?

23       A    Correct.

24       Q    All right, and what is it of?

25       A    This is the FD302 report of interview with Bailey

1    Decker.

2         Q    And who's Bailey Decker?  Someone the Court heard

3    from last week; is that right?

4         A    Yes, that's Mr. Dunn's girlfriend.

5         Q    Okay, and if we -- last week, Ms. Decker testified in

6    response to a question from the defense counsel, okay, and did

7    you also tell officers that Mr. Dunn smokes occasionally?  And

8    she said I did.  And the question was okay and why did you say

9    that?

10        And Ms. Decker said I was nervous and scared.  I didn't

11   want anyone to get in trouble, because I don't know if Austin,

12   that's the Defendant, right?

13        A    Correct.

14        Q    Actually smokes or not because it was mine.  That was

15   in reference to marijuana; is that right?

16        A    Correct.

17        Q    Okay.  And then, she also said it was him, too, in

18   her testimony last week as well; is that right?

19        A    She believed it was him.

20        Q    Okay.  That's what she said last week in her

21   testimony --

22        A    That's correct.

23        Q    -- to this Court?  Okay.  If you look at this 302,

24   though, and please for the Court, describe the circumstances

25   surrounding this interview done by Ms. Decker?

```
 1        A     During this interview, Rick Dunn arrived while Bailey
 2   was being interviewed outside.  And Rick Dunn said that he
 3   didn't know if they should be talking to the agents about --
 4        Q     Let me stop you right there.  Were you at the
 5   interview?
 6        A     No.
 7        Q     Okay, tell the Court who was at the interview?
 8        A     Special Agent Christopher Jancosco (phonetic) and
 9   Task Force Officer Alan Gehring (phonetic).
10        Q     Okay, and they were talking to Ms. Decker; is that
11   right?
12        A     Yes, outside the residence.
13        Q     Whose residence?
14        A     Rick Dunn -- well, actually in front of Austin Dunn's
15   residence, which is in close proximity to Rick Dunn's.
16        Q     All right, was she under arrest, was she handcuffed,
17   anything like that?
18        A     No.
19        Q     Okay, so while they're talking to her, the -- Mr.
20   Dunn, the Defendant's father, comes out to the interview; is
21   that right?
22        A     Correct.
23        Q     Okay, tell the Court what happened then?
24        A     He said words to the effect of I don't know if we
25   should be talking to you without an attorney present.  Chris
```

1    Jancosco said we will absolutely get in our cars right now and

2    leave if that's what you wish.

3         And he responded that, well, if Bailey is comfortable

4    talking with you, then that's fine.  And he said that he had

5    some things or thoughts that he would like to share with the

6    agents as well, but that he had to go to a meeting.

7         And so, Mr. Dunn left.  Bailey said she was comfortable

8    continuing the interview and she did continue the interview.

9         Q    Okay, she didn't say she was nervous or scared?

10        A    No.

11        Q    Okay, if you look in this 30 -- so the 302 is what,

12   it's a summary of the interview; is that right?

13        A    Correct.

14        Q    All right, anywhere in here does it say that she was

15   nervous or scared or told the agency she was nervous or scared

16   or appeared to be nervous or scared?

17        A    No.

18        Q    If you look down in the fourth full paragraph here,

19   it says Decker knew Dunn had served in the U.S. Marine Corps

20   and was last stationed at U.S. Marine Corps Reserve Unit in

21   Lubbock, Texas.  That was true; is that right?

22        A    Yes.

23        Q    Based on the military records?

24        A    Correct.

25        Q    Okay.  And then next, it says Decker stated Dunn had

1    told her he had deployed to both Afghanistan and Iraq.   And

2    during one of those deployments, he was injured by an

3    improvised explosive device, which he had lost some of his

4    hearing.   That is not true according to the military records;

5    is that right?

6         A    That's right.

7         Q    Also, Mr. Dunn's father confirmed that, too; is that

8    right?

9         A    He did.

10         Q    She said that he was -- that Mr. Dunn was in a car

11    accident about a year ago and suffered some injuries.   As far

12    as the time frame goes, do you know when he was in a car

13    accident?

14         A    No.

15         Q    You've heard from other witnesses he was in a bad car

16    accident, he smokes marijuana to deal with the car accident

17    injury; is that right?

18         A    That's correct.

19         Q    And it says Decker stated Dunn advised the U.S.

20    Marine Corps Reserve Unit in Lubbock was deploying to

21    Afghanistan and Dunn didn't have enough time on his contract.

22    Well, he had six years left, didn't he?

23         A    Yes.

24         Q    Okay, to deploy and he stayed behind until he was

25    discharged; is that right, sir?

1       A    Yes.

2       Q    All right, and then, the next paragraph says Decker

3    admitted the marijuana and bong on the table Tuesday morning.

4    Tuesday morning was the day you served the search warrant; is

5    that correct, sir?

6       A    Correct.

7       Q    But they belonged to her; is that correct?

8       A    Yes.

9       Q    All right, nowhere in here does she say that it was

10   hemp; is that right?

11      A    That's right.

12      Q    Okay.  If she had told the agents, well, that was

13   actually hemp and that's legal, the agents would have wrote

14   that down; is that true?

15      A    That's true.

16      Q    Decker stated she suffers from depression and she

17   uses marijuana to help her; is that right?

18      A    Yes.

19      Q    Even though she didn't have a prescription for it, if

20   you go to the second page here, when asked if she ever

21   witnessed Dunn take any illegal drugs, not just marijuana, just

22   illegal drugs, is that what it says?

23      A    Yes.

24      Q    During the month they had been living together,

25   Decker advised Dunn would have -- would smoke some of her

35

```
 1    marijuana, but she didn't see him use any other drugs or

 2    medication.  Do you see that, sir?

 3        A    Yes.

 4        Q    Okay, so this report is actually done contemporaneous

 5    with the actual interview of Ms. Decker; is that right?

 6        A    Yes.

 7        Q    Close in time, right?

 8        A    Right.

 9        Q    That's to make sure it's as accurate as possible?

10        A    Yeah, it says it was -- investigation was on June

11    12th and it was drafted on June 12th.

12        Q    Same day?

13        A    Same day.

14             MR. EASON:  If I may have one second, please, Your

15    Honor?

16             THE COURT:  You may.

17             MR. EASON:  I have nothing further for this witness,

18    Your Honor.

19             THE COURT:  The Court has a question that it wants to

20    ask about the records prior to Ms. Adams.

21             And then, Ms. Adams, you can certainly ask any

22    questions.

23             Agent Cotner, I want to make sure in connection with

24    Government's Exhibit A, it appears that the totality of the

25    records related to the Lubbock Police Department and the
```

1    criminal history are dated for the year 2012 with the exception

2    of one record.

3            And one record listed as report officer 163204,

4    Sanchez, Lauren Casey (phonetic) has a report date of 5/6/2020.

5            THE WITNESS:  Yeah.

6            THE COURT:  Okay, and I just want to make sure, is

7    that date correct?

8            THE WITNESS:  Yes, that's when he collected his

9    Taurus pistol back from the Lubbock Police Department after he

10   got off probation.

11           THE COURT:  Okay.  All right, thank you.

12           MS. ADAMS:  May I proceed, Your Honor?

13           THE COURT:  You may, Ms. Adams.  Thank you.  I just

14   wanted to clarify that that date was correct.

15                       CROSS-EXAMINATION

16   BY MS. ADAMS:

17       Q   Mr. Cotner, let's first talk about -- let's see,

18   Exhibit C, which would be the military records.

19       A   Okay.

20       Q   Okay, and in the military records, you reviewed them,

21   correct?

22       A   I have.

23       Q   And the record stated that he was discharged because

24   he had been charged with four different cases, correct?

25       A   I mean, I don't remember it saying four different

1    cases.  That sounds about right, though.

2        Q    Okay.  I believe it specifically says that he was

3    charged with two felonies and two misdemeanors; is that

4    correct?

5        A    Yes.

6        Q    Okay, and that was the reason for his discharge?

7        A    Correct.

8        Q    Okay.  Now in the end, he was actually charged with

9    two cases, correct?

10       A    Well, I mean, he was charged with all of them and

11   then, yeah, they were reduced to two charges.  And he served

12   probation for two charges.

13       Q    So if the Pre-trial Services Report says that the

14   prosecutor has rejected the charge without a pre-trial

15   diversion, which one do -- would be correct?

16       A    I'm sorry, I'm -- can you repeat the question?

17       Q    Okay, you're saying that they were reduced or they

18   were combined in some way.  Okay, but the Pre-trial Services

19   Report, it says the prosecutor has rejected the charge.  That's

20   different, correct?

21       A    Yes.

22       Q    Okay.  And Mr. Dunn wasn't convicted of any of those

23   offenses, correct?

24       A    He was convicted -- no, he was not convicted.  He

25   served deferred adjudication and probation for two.

1   Q   Okay, in regards to Exhibit A, you also mentioned

2   that Mr. Rick Dunn contacted the officer per the reports,

3   correct?

4   A   Yes.

5   Q   And on that same report, it also states that other

6   people called regarding the case as well, correct?

7   A   Yes.

8   Q   Okay.  In regards to Exhibit B, the report regarding

9   Bailey Decker, now you weren't present, correct?

10  A   I was not.

11  Q   Okay, now was this interview recorded?

12  A   No.

13  Q   Was there any type of body or dash camera?

14  A   No, we don't have those.

15  Q   Okay, so the report is from the agent and it's based

16  on their recollection, correct?

17  A   Based on their notes and their recollection.

18  Q   But if there were some type of camera, that could

19  just solve all the issues, correct?

20  A   If there is an issue, then yeah, it would solve it.

21  Q   Okay.  Now in his -- in Exhibit A, the police reports

22  from Lubbock, anywhere in those records does it say that he

23  resisted arrest?

24  A   It says that he was out of control when they were

25  trying to, I think, take him to the hospital and that the

1    officer had to put a taser up to his side and warn him that he

2    needed to comply or calm down.

3        Q    That he needed to -- that the EMTs were there to help

4    him, correct?  That's what it says?

5        A    I'd have to see it to speak to it specifically.  I

6    mean, there's several pages of this Lubbock Police report.  I

7    can't recall every word in it.

8        Q    Okay.  Well, feel free to refresh your memory.

9        A    Can you refer me to where you're talking about?

10       Q    No, I cannot.  I read them.  That's where I got it

11   from.

12            MR. EASON:  Your Honor, this is --

13            THE COURT:  I certainly understand you can't recall

14   all of the records.

15            You can take an opportunity if you'd like to review

16   them or otherwise if you're unable to answer the question, you

17   may say so.

18            THE WITNESS:  I'll take a minute, see if I can locate

19   what you're referring to.

20            MS. ADAMS:  Uh-huh.

21            MR. EASON:  Can we -- and what was the question

22   again, Your Honor?  Would that be permissible to have that

23   repeated, please?

24            THE COURT:  I'm not able to read it, because we're on

25   a recorder.

40

1          But Ms. Adams, if you want to restate your question,

2     you can.

3     BY MS. ADAMS:

4          Q    I believe the question was that officers never -- he

5     never resisted arrest.  I believe the agent said something to

6     the effect of they had to use a taser due to the EMTs.  And I

7     said that the officer explained to him that the EMTs were there

8     to help him.

9          A    Could I just read what it says?  It says EMS arrived

10    on the scene and began checking Dunn for any injuries.  They

11    placed him on to a stretcher and put him into the back of an

12    ambulance.

13         While in the ambulance, EMS personnel yelled at me and

14    said they needed assistance with Dunn.  Dunn was trying to get

15    up off of the stretcher.  I ran to the ambulance and told Dunn

16    to comply with the EMS personnel because they were trying to

17    help him.

18         Q    Okay.

19         A    He was yelling and trying to get up.  He seemed very

20    incoherent.  I took my LPD-issued X26 taser and removed the

21    cartridge.

22         I placed the taser against Dunn's side and told him if he

23    did not comply, I would tase him.  Dunn immediately became calm

24    and seemed to understand the warning.

25         Q    Okay, and prior to that --

1      A    Can I continue, please?

2      Q    No.  Prior to that, it also --

3           THE COURT:  Ms. Adams, I'm going to let the witness

4    finish his answer, okay?

5           MS. ADAMS:  Uh-huh.

6           THE COURT:  So, Agent Cotner, if you have something

7    further to complete your answer, you may do so.

8           THE WITNESS:  Yes, it says to this point, Dunn had

9    been very uncooperative.

10          THE COURT:  Thank you.

11          Ms. Adams, you may proceed.

12   BY MS. ADAMS:

13     Q    And it also said that he was extremely incoherent.

14   He was breathing -- like he told me that he felt light-headed,

15   correct?

16     A    Yes.

17     Q    Okay.  So that would be a no, he didn't attempt to

18   resist arrest, correct?

19     A    Correct.

20     Q    Okay, and --

21     A    Because he wasn't being --

22     Q    -- there is -- it's also correct that he didn't

23   attempt to flee, correct?

24     A    Correct.

25     Q    All right.  And in regards to the public intoxication

1    that you mentioned, it says that the officer requested that

2    they dismiss the citation, correct?

3         A    Again, I'd have to pull it up to see what you're

4    talking about.

5         Q    So it is -- report is 12 at the top 30853, supplement

6    number 5.  It's toward the bottom of the page.

7         A    Can you repeat the question?

8         Q    The public intoxication ticket, it was dismissed at

9    the request of the officer, correct?

10        A    I'm just not seeing that, but that's definitely

11   possible.

12             MS. ADAMS:  May I approach the witness, Your Honor?

13             THE COURT:  You may.

14             MR. EASON:  Your Honor, I ask the defense counsel to

15   show them first?

16             THE WITNESS:  Yes, that's correct.  It says dismissed

17   in the interest of justice.

18   BY MS. ADAMS:

19        Q    Now let's go to Exhibit C, the military records.

20   Anywhere in those records did it say that she didn't show up or

21   anything like that, that he went AWOL, went missing?

22        A    No.

23        Q    Okay, he didn't stop reporting for duty or anything

24   like that?

25        A    Not that I know of.

```
 1          Q    Okay.  Now let's talk about something that we
 2     discussed last week maybe on the 18th?
 3          A    Okay.
 4          Q    Do you recall talking about Mr. Dunn's Lubbock cases?
 5          A    Yes.
 6          Q    Okay, and did you have a opportunity to review --
 7               MS. ADAMS:  I'm not sure which exhibit it was last
 8     week, Your Honor.  If I may approach?
 9               THE COURT:  What are you approaching for?
10               MS. ADAMS:  To see which exhibit number this was last
11     week.  I don't want to refer to it incorrectly because I
12     believe the Court had the originals.
13               THE COURT:  They're with the Clerk's Office now
14     because they'd been filed from the hearing.
15               MS. ADAMS:  Oh, okay.  I'm sorry.
16     BY MS. ADAMS:
17          Q    Now in regards to his Lubbock cases, you talked about
18     his probation violation.  Do you recall that?
19          A    Yes.
20          Q    Okay.  Did you have a opportunity to review the
21     motion associated with that?
22          A    With the probation violation?
23          Q    Yes.
24          A    Not that I recall.
25          Q    Okay, and you also stated that you talked with his
```

1    former probation officer?

2        A    Yes.

3        Q    Did she ever tell you that he failed to report?

4        A    Not that I recall.

5        Q    Did she ever tell you that he failed to attend a

6    court setting?

7        A    I don't recall that.

8        Q    Okay.

9            MS. ADAMS:  No further questions, Your Honor.

10            THE COURT:  Thank you.

11            Mr. Eason, anything further for this witness?

12            MR. EASON:  Yes, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. EASON:

15       Q    In the -- with respect to the motion with respect to

16   probation from all the stuff we had talked about, Special Agent

17   Cotner, the -- it was detailed out that Mr. Dunn did fail to

18   submit urine specimens approximately 30-plus times; isn't that

19   true?

20       A    The Probation Officer, I believe she said

21   approximately 23 times, but if there's a report that says --

22       Q    Well, let's clarify that.  Approximately 23 times, he

23   tested positive for marijuana or cocaine; is that right?

24       A    That's right.

25       Q    Okay.  But as far as failing to submit a urine

45

1    specimen, that was approximately 30-plus times; isn't that

2    true?

3        A    That sounds accurate.

4             MR. EASON:  No more questions.

5             THE COURT:  Thank you.

6             Ms. Adams, anything further for this witness?

7             MS. ADAMS:  No, Your Honor.

8             THE COURT:  All right, Agent Cotner, you may step

9    down.

10             Mr. Eason, just to confirm, this was the sole witness

11    you intended to present today, so there's no further evidence

12    you desire to proffer to the Court at this time; is that

13    correct?

14             MR. EASON:  No further evidence, Your Honor.  If the

15    Court would indulge me with some comments with respect to some

16    of the evidence at the end of the hearing, if the Court would

17    like to hear them, we can do that.

18             THE COURT:  I will hear argument from each of you.

19             All right, Ms. Adams, do you have a further witness

20    to present at this time?

21             MS. ADAMS:  Yes, Your Honor, I'd like to call Bailey

22    Decker.

23             THE COURT:  All right, Ms. Decker, if you can come

24    forward.

25                              BAILEY DECKER

1    called as a witness for the Defendant, having been duly sworn

2    testified as follows:

3              THE COURT:  Okay, Ms. Decker, once you're seated, if

4    you can do me a favor and go ahead and state your full name for

5    the record, again, as well as spell it?

6              THE WITNESS:  Bailey Rae Decker, B-A-I-L-E-Y R-A-E

7    D-E-C-K-E-R.

8              THE COURT:  Thank you.  And Ms. Decker, I'm just

9    going to remind you, as I did the last time you were with the

10   Court, particularly in light of the alleged marijuana use, that

11   you do have the right to remain silent.

12             You don't have to say anything at all that would

13   incriminate you in connection with any crime whatsoever.  And

14   so, I do just want you to be mindful of that while we're here

15   today, okay?

16             THE WITNESS:  Okay, thank you.

17             THE COURT:  All right.

18             Thank you, Ms. Adams, you may proceed.

19             MS. ADAMS:  Thank you, Your Honor.

20                          DIRECT EXAMINATION

21   BY MS. ADAMS:

22        Q    Now, Ms. Decker, do you recall when the agents came

23   to your house?

24        A    Yes.

25        Q    Okay, the agents that interviewed you, did they

1    record the conversation or anything like that?

2         A    Not to my knowledge.

3         Q    Okay, and you again -- you understand why we're here?

4         A    Yes.

5         Q    Okay, so to move forward in regards to the questions

6    that the officers or the agents asked you, at that point, were

7    you nervous or afraid?

8         A    I was nervous, yes.

9         Q    Okay, so -- and you don't have to say you're nervous

10   to be nervous, correct?

11        A    Correct.

12        Q    All right.

13        A    And I also suffer from severe anxiety, too.  So

14   that's going on at all times.

15        Q    I understand.  Thank you for sharing that.  The

16   question about Mr. Dunn's military service, how did that come

17   about?

18        A    I believe they asked me if he had any back injuries

19   or if he had ever -- if I knew anything about his military

20   service.

21        And with everything going on, the -- my dog was running

22   around.  I was trying to make sure he wasn't going to run out

23   into the road.

24        And me being anxious, I got -- he told me a story one time

25   about somebody he knew who was an Afghanistan that stepped on

```
 1    an IED.

 2         And with everything going on, everything just kind of got

 3    mixed up in my head.  And I mixed up the story that he told me

 4    about somebody he knew versus him not actually deploying.

 5         Q    Okay, so in regards to the back injuries or pain, so

 6    he does suffer from back injuries?

 7         A    Yes.

 8         Q    Okay.  Was that from the surgery?

 9         A    I believe he got into a car accident, which caused

10    most of the back pain.

11         Q    Okay, did he have the surgery after that or do you

12    know?

13         A    I'm not sure if it was after that.

14         Q    Okay.  Do you know if he's currently suffering from

15    back pain?

16         A    Yes.

17         Q    Okay.  In regards to the deployment question, did the

18    agents ask like any additional details or anything like that?

19         A    They asked if I knew anything that if he did deploy,

20    if I knew anything about his deployment.

21         Q    Okay, did -- at that time, were you kind of

22    overwhelmed or what was going on with you?

23         A    I was overwhelmed.  I was very anxious, also trying

24    to watch my pup -- our puppy, who was running up and down on

25    the porch, running around the yard, trying to make sure he
```

1    wasn't trying to eat anything.

2        Q    Okay, do you still feel the same way as you did on

3    the 18th, meaning that you don't feel that Mr. Dunn is a threat

4    to anyone?

5        A    Correct.

6        Q    You've never seen him be violent?

7        A    No.

8        Q    Okay, he was compliant with the officers on that day?

9        A    Yes, ma'am.

10       Q    He didn't try to run or flee?

11       A    No.

12       Q    Okay, he didn't try to resist arrest?

13       A    No.

14       Q    And you're still willing to assist, if the Court

15   requests, to bring him to Court and make sure he attends his

16   court dates?

17       A    Yes, ma'am.

18            MS. ADAMS:  Okay.  No further questions, Your Honor.

19            THE COURT:  Thank you.

20            Mr. Eason?

21            MR. EASON:  Yes, Your Honor.  May I have a second,

22   please?

23            THE COURT:  You may.

24                         CROSS-EXAMINATION

25   BY MR. EASON:

1    Q    And, Ms. Decker, good morning, my name is Chris

2    Eason.  I'm the Assistant U.S. Attorney.  We've never met

3    before; is that correct?

4    A    Correct.

5    Q    Okay, now, with respect to Mr. Dunn's military

6    service, you said that you just got it jumbled up in your mind

7    and confused that he was the one who told you Mr. Dunn had the

8    deployed to Afghanistan and Iraq, but really it was one of his

9    friends; is that right?

10   A    Somebody he used to know, yes.

11   Q    And that's because your dog was running around,

12   that's why you confused that fact?

13   A    Well, there was a lot going on previously.  When I

14   saw the FBI for the first time, I had guns pointed at my face.

15   I just woke up.  It's a little scary to see the agents, who

16   were behind all of that, show up at your house.

17   I have anxiety and I was also trying to focus on my puppy,

18   to make sure he wasn't going to eat anything or run into the

19   road.

20   Q    Okay.  So you were --

21   A    I was anxious and I was a little scared and --

22   Q    Okay, I understand that.  And just take as much time

23   as you need to answer my questions, okay?

24   A    Yeah.

25   Q    I'm not trying to trick you here or intimidate you or

1    anything.  I just want to just get the truth out as you know

2    it, you know, to the judge, okay?

3         A    Okay.

4         Q    All right.  These -- you said agents pointed guns in

5    your face?

6         A    When they showed up at the house, when the S.W.A.T.

7    knocked on the door and we opened the door, there is guns

8    pointed at us.

9         Q    You said we opened the door.  Did you open the door

10   or did Mr. Dunn open the door?

11        A    He opened the door and I was directly behind him.

12        Q    Okay, and you could see around him, I take it?

13        A    Yes.

14        Q    Okay.  And then that was -- there were a couple days

15   in between that instance and the time when these agents came

16   out to talk to you; is that right?

17        A    Yes.

18        Q    Now when these agents came out and talked to you,

19   they didn't have camouflage on, did they?

20        A    No, but they were still at the scene when everything

21   happened.

22        Q    Okay, when they were at the scene, they didn't have

23   camouflage on at the scene, they were there just to interview

24   people and talk to people; is that right, and collect evidence?

25        A    I believe so.

```
 1        Q    They didn't have a helmet on.  They weren't part of

 2   the S.W.A.T. team; is that right?

 3        A    Correct.

 4        Q    Okay, they weren't in that S.W.A.T. vehicle that came

 5   up in the yard with the loud P.A. system, right?

 6        A    No.

 7        Q    Okay, and that startled you, right --

 8        A    Yes.

 9        Q    -- when the S.W.A.T. team came on there?  Okay.  Now

10   when they showed up, these agents didn't point a gun to you?

11        A    No.

12        Q    They didn't yell at you, did they?

13        A    No.

14        Q    They didn't scream at you?

15        A    No.

16        Q    They asked you, you know, if you were comfortable, if

17   you're willing to proceed with the interview, right?

18        A    They never asked if I was comfortable.

19        Q    Well, they didn't --

20        A    They just were talking to me and asking questions.

21        Q    Okay, so you were in the courtroom when Special Agent

22   Cotner testified?

23        A    Yes.

24        Q    All right, so did Mr. Dunn, did the Defendant's

25   father come and approach the agents while they were
```

1    interviewing you?

2        A    Yes.

3        Q    Okay, and tell the Court what happened then?

4        A    He asked to see their badges.  He asked who they

5    were.  He asked if we needed any -- if we needed our lawyer

6    there.

7        They said if he wanted them to leave, they would leave.

8    And he said that he's willing to talk to them, but he had an

9    appointment or something or he had to babysit.  So he had to

10   leave.  And then, he left and they still talked to me.

11       Q    All right, and did the father not also say as long as

12   you're comfortable, Ms. Decker, you could talk to him?

13       A    That was not said.

14       Q    Oh, that wasn't said, okay.

15       A    No.

16       Q    So you dispute that then?

17       A    What was that?

18       Q    It's not that it's possible that was said.  You're

19   saying, as a matter of fact, 100 percent, that was not said, is

20   that what you're --

21       A    That was not said.

22       Q    It was never said, okay.

23       A    No.

24       Q    And is it possible you were distracted because of the

25   dog and the anxiety when that was said, that you didn't hear

1   that?

2       A    It's possible, but Rick did not say that if I'm

3   comfortable.

4       Q    Okay, now with respect to his military service, that

5   was a story that he told you about his buddy or someone he used

6   to know?

7       A    I don't know if it was his buddy, but it was somebody

8   he knew.

9       Q    Okay.  Now the FBI also wrote down -- well, let me

10  just ask you this.  Did you also tell the FBI that, well, the

11  Defendant's reserve unit was going to deploy to Afghanistan,

12  but because he didn't have enough time on his contract to

13  deploy, he stayed behind until he was discharged?  Did you tell

14  the FBI that?

15      A    I don't remember.

16      Q    Okay, you don't remember.  So if they --

17      A    I don't remember that part, no.

18      Q    Okay, are you denying that happened or you're just

19  saying you don't remember?

20      A    I'm saying I don't remember.

21      Q    Okay, so if the FBI says that you said it, and they

22  took it down in notes, and they put it in a -- in official

23  form, the same day of the interview, would you agree that's

24  true?

25      A    It could be.

1    Q    Okay, so you've heard the testimony again.  I'm not

2    going to walk you back through all the exhibits, okay?

3    A    Uh-huh.

4    Q    But his military records show that he came in in 2010

5    near the end and he was scheduled to stay with the Marines till

6    2018.

7    But he was discharged in late 2012 for misconduct and

8    commission of serious offense with the least favorable

9    administrative discharge characterization, which is under other

10   than honorable conditions.  Did you hear all that testimony?

11   A    Yes.

12   Q    Okay, that has nothing to do with the fact that his

13   unit's deploying.  And he just doesn't have enough time to

14   deploy with them because of his contract.  He had six years

15   left on his contract.  Do you understand all that?

16   A    Yes.

17   Q    Would you agree that he lied to you about that?

18   A    I wouldn't say he lied.  I might be remembering

19   things wrong.

20   Q    Okay, so if there's a problem with the evidence as

21   you know it and the actual real evidence, the military records,

22   there are problems with your memory, is that what your

23   testimony is?

24   A    It could be.

25   Q    Okay, what else could it be?

1       A     Maybe it could have been him talking about somebody

2    else he also knew.

3       Q     Okay, so you think Mr. Dunn represented to you that

4    Mr. Dunn got out of the military in 2012 because someone else

5    had to deploy to Afghanistan, but they couldn't make their

6    deployment because they had little time left in their contract?

7    Is that what your testimony is?

8       A     No.

9       Q     Okay, so you understand there's --

10      A     I'm sorry, I'm just really nervous.

11      Q     You're fine.  And let's just take a second and just

12   pause for a second.  But you agree there's an inconsistency

13   between what you told the FBI about what the Defendant told you

14   with respect to his military service and what you're saying

15   today?

16      A     Yes.

17      Q     And you also realize there's an inconsistency between

18   what you told the Court Mr. Dunn had told you about his buddy,

19   and also these records told the Court about Mr. Dunn, and what

20   the FBI wrote down?  Do you understand that?

21      A     I believe so.

22      Q     Do you love Mr. Dunn?

23      A     Yeah.

24      Q     All right, you moved down here from Washington,

25   right?

```
 1        A    Yes.

 2        Q    Okay, you want to spend the rest of your life with

 3   him?

 4        A    Yeah.

 5        Q    Okay, so do you have an opinion as to his character

 6   of truthfulness?

 7        A    What was that?

 8        Q    Do you have an opinion as to his character of

 9   truthfulness?

10        A    He's very truthful.

11        Q    Very truthful?

12        A    Yes.

13        Q    Okay, despite the fact that he told you that he was

14   going to be -- that he was discharged because he didn't have

15   enough time left on his contract to deploy to Afghanistan when

16   in fact he had six years left on his contract.  Do you still

17   think he's a truthful person?

18        A    Yes.

19        Q    Okay, you said that he still suffers from back pain

20   today; is that right?

21        A    Yes.

22        Q    Okay, and you're aware that he smokes marijuana to

23   deal with his back pain, are you not?

24        A    In the past he did, yes.

25        Q    Okay, and how do you know that?
```

1      A     Because of what was brought up today and what was

2    brought up last week with his -- the failed drug test and the

3    testimonies from his mom.

4      Q     Okay, his mom said he smokes marijuana occasionally

5    to deal with his back pain; is that correct?

6      A     In the past, yes.

7      Q     Okay, and specifically, it's because he doesn't want

8    become addicted to opioids is what he told his mom; is that

9    right?

10     A     Yes.

11     Q     Okay, would you be surprised to learn he also told

12   his previous Probation Officer he smokes marijuana to deal with

13   the back pain, because he doesn't want to become addicted to

14   opiates?

15     A     I'm sorry, I couldn't hear you.

16     Q     He also told his Probation Officer that, are you

17   aware of that?

18     A     I was not aware of that.

19     Q     All right, so he's told two people that.  And you're

20   telling this Court you haven't seen him smoke marijuana at all

21   in the past month?

22     A     No.

23     Q     All right, despite telling the FBI earlier that he

24   smokes marijuana occasionally with you?

25     A     I want to point out that I never said I had

1    marijuana.  They said the bong in what looks like weed on the

2    table, whose is it?  And I said the stuff on the table is mine.

3         Q    Okay, now they also asked you did he use any illegal

4    drugs is the phrase they used?

5         A    And I said no.

6         Q    Okay, well, according to the FBI, he said, well, he

7    smokes marijuana occasionally.

8         A    But I did not say that he smokes any or he uses any

9    illegal drugs.  And I did not say he smokes marijuana.

10        Q    Okay, did you tell the FBI that in response to a

11   question about whether he uses illegal drugs, that yes, he

12   smokes marijuana with me occasionally?

13        A    They did not -- that was not my answer to the does he

14   use illegal drugs?

15        Q    So let me stop you right there.  I'm going to ask you

16   a yes or no question.  Did you tell the FBI in response to does

17   he use illegal drugs that, yes, he smokes marijuana with me

18   occasionally?

19        A    No.

20        Q    Never told the FBI that?

21        A    No.

22        Q    Did you tell the FBI anything similar to that?

23        A    They asked if he ever smokes and I said I think

24   occasionally.

25        Q    Smokes?

 1        A     They just said smokes.

 2        Q     Okay, so they didn't use the phrase illegal drugs?

 3        A     No.  They asked me if I've ever seen him do illegal

 4   drugs.  I said no.  They asked if he ever smokes and I said I

 5   think occasionally.

 6        Q     All right, and that was in the context of them

 7   talking about marijuana on your table and a bong?

 8        A     That was after they asked if he had ever used illegal

 9   drugs.

10        Q     All right, and that was also in the context of them

11   talking about the bong on the table?

12        A     It could have been, but they didn't specify what they

13   were talking about.

14        Q     Well, what do you mean, it could have been?  How long

15   was the interview?

16        A     What?

17        Q     How long was the interview?

18        A     Maybe 10, 15, 20 minutes.  I don't know.

19        Q     Okay, so less than 20 minutes, correct?

20        A     Possibly.

21        Q     Okay, and during that interview, they raised the fact

22   there was marijuana on the table; is that right?

23        A     Yes.

24        Q     Okay, and according to them, you told them it was

25   marijuana?

```
 1        A     I did not say it was marijuana.  I answered their

 2   question that what was on the table was mine.

 3        Q     Okay, I understand that's what you're saying, all

 4   right, but they -- that was discussed during the interview --

 5        A     Uh-huh.

 6        Q     During the 15 minute interview, 15 to 20 minutes,

 7   correct?

 8        A     Yes.

 9        Q     The bong on the table was also discussed; is that

10   correct?

11        A     Yes.

12        Q     Okay, and in the context of that, they asked you

13   about whether he did any illegal drugs; is that correct?

14        A     Yes, and I said no, because he does not.

15        Q     Okay.  All right, I just want to make sure here.  You

16   understand it's a crime to lie to the FBI, right?

17        A     Yes, I do.

18        Q     Okay, and so, is your testimony that you lied to the

19   FBI or that you told them something you were confused about?

20   Or that the FBI was totally wrong?

21        A     I never lied to the FBI.  I didn't lie to the FBI.

22        Q     You didn't lie to the FBI?

23        A     No.

24        Q     Okay, so how do you explain the inconsistency between

25   what the FBI wrote down and the --
```

1          MR. EASON:  Your Honor, permission to approach and

2     hand the witness Exhibit B?

3          THE COURT:  You may.

4          MR. EASON:  Okay.  Is there a clean copy, Your Honor?

5     I want to get my copy --

6          THE COURT:  You may, but counsel, can you all

7     approach for just a moment?

8       (Bench conference, off the record)

9          MR. EASON:  Your Honor, may I approach the bench?

10    May counsel approach the bench one more time, please?

11    BY MR. EASON:

12    Q    Now, ma'am, I want to ask you an open-ended question,

13    just to get your explanation, okay?  There are inconsistencies

14    between the FBI 302, that we heard testimony about earlier

15    today, and between what your testimony is.  How do explain

16    those inconsistencies?

17    A    I believe that some of the things they wrote down are

18    not actually what I said.  When it comes to the military

19    records, I did get messed up and I admitted to that.

20         But some of the things that the FBI wrote down, that they

21    said I answered or the way they questioned me is not actually

22    how the -- it happened, or how I answered, or how they

23    questioned me.

24         MR. EASON:  Okay, no more questions, Your Honor.

25         THE COURT:  Thank you very much, Mr. Eason.

1          Ms. Adams, any further questions for this witness?

2          MS. ADAMS:  Yes, Your Honor.

3                         REDIRECT EXAMINATION

4    BY MS. ADAMS:

5       Q    Ms. Decker, if Mr. Dunn was discharged from the

6    military with six years left or if -- no matter what the story

7    was, does that change your view of Mr. Dunn?

8       A    No.

9          MS. ADAMS:  Okay, no further questions.

10          THE COURT:  All right, thank you, Ms. Decker.  You

11   may step down.

12          Ms. Adams, do you have any further witnesses to

13   present or evidence to proffer to the Court at this time?

14      (Witness excused)

15          MS. ADAMS:  No, Your Honor, I do (indiscernible).

16          THE COURT:  Okay.

17          MS. ADAMS:  Oh, I'm sorry, yes, Your Honor.  This was

18   an exhibit from the, not last week, but the week before.  I

19   don't know how it was marked, but I want to refer to it in

20   argument.  But it looked like this is my last point.  If you

21   would like it, I will provide it to you.

22          THE COURT:  Well, if we're certain that it was

23   admitted, then you can use it.  But if not, you might want to

24   mark it again and provide the Government an opportunity to look

25   at it.  And we'll have it admitted, so that it's clear that

1    it's part of the record.

2              MR. EASON:  Your Honor, if I may, I have a copy of

3    the Defense exhibits.

4              THE COURT:  Okay.

5              MR. EASON:  The filed copy with the Defense exhibits

6    numbers on here.

7              THE COURT:  Then, Ms. Adams, do you want to look at

8    those just very quickly?

9         (Counsel confer)

10             THE COURT:  All right, Ms. Adams, yes, you may

11   approach.

12             MS. ADAMS:  This was Exhibit 7.

13             THE COURT:  Thank you very much.

14             MS. ADAMS:  Thank you.

15             THE COURT:  All right, and the Court will note for

16   purposes of the record that it has thoroughly reviewed all of

17   the prior exhibits.  I just don't have your originals.

18             All right, Ms. -- this is not a presumption case.

19   We'll hear from the Government first?

20             MR. EASON:  Yes, Your Honor, since the Court already

21   had received comments from Ms. Smith last week, I'm not going

22   to belabor those.

23             I would like to point out that, in this case, the

24   Court does have the benefit of seeing what Mr. Dunn -- how he

25   behaves when he actually is under probation or in under some

1    type of supervised condition.

2            And when you look at the exhibits that the Defense

3    provided you last week, you see approximately 33 times that he

4    failed to show up for a urinalysis and 23 times where he

5    actually tested positive for a urinalysis, just violating

6    probation.  He's not a suitable candidate.  There are too many

7    red flags here.

8            I will note that if you look at the transcript that

9    was produced and remember the testimony from the father, he

10   said that Mr. Dunn has -- the Defendant has lived with him for

11   28 of the last 30 years.

12           Well, he was on probation for about six years.  And

13   he tested positive numerous, numerous times.  In that

14   testimony, the father said I know he's not a drug user, period.

15           And, look, his dad loves him.  We get it.  His

16   girlfriend loves him.  We get it.  They're not suitable third-

17   party custodians, not here in this case.

18           You see the dad's bias towards his son in the police

19   reports.  The dad also testified two weeks ago that he's never

20   known him to be violent.

21           Well, clearly, he can be a violent person.  The best

22   neutral third-party unbiased objective person here would be the

23   prior Probation Officer, which Special Agent Cotner testified

24   last time about that witness' opinions and observations about

25   the Defendant, specifically that he can be a violent person and

1    that he told her that she was the only one in law enforcement

2    that he didn't want to kill.  That is consistent with the

3    offenses that have been charged here.

4          If the Defendant is living with his parents and still

5    testing positive, living with the family on the family's ranch,

6    what the Defense has proposed is not suitable.  It's just not

7    appropriate in this situation.  It's just not appropriate in

8    any situation as a matter of fact.

9          And there -- one more thing I'd like to point out,

10    Your Honor.  Obviously, you have information that Probation has

11    given you after Probation does their interviews.

12          But there are some inconsistencies between what they

13    gave you and between what we presented today with

14    respect -- additional information with respect to the police

15    reports and the actual substance of the facts backing up the

16    charges of using real weapons and firing weapons at people

17    above peoples' heads.

18          But also with respect to the military service, that

19    is obviously the character of the Defendant is something you

20    can consider here.

21          But the report indicates that probation officer

22    received this information from the Defendant.  There's nothing

23    in here about an under -- other honorable conditions discharge

24    in here, nothing.  It is designed to mislead that he received

25    an honorable discharge.

1            And we had the misimpression at the beginning as you

2    know from our filing from last Thursday, but when you look at

3    the paperwork, you get into the weeds of it, and talk to

4    someone in the Navy, that is not what happened.

5            And the reason the Navy discharged him wasn't because

6    he had two felonies and probation.  It's because of his

7    character.

8            And that's why it's appropriately defined as the

9    characterization, whose overall service from 2010 to 2012.

10   When you read those documents is he tainted the esprit de corps

11   of the Marine Corps.  And he's not a suitable candidate for the

12   Marine Corps.

13           He's not a suitable candidate for release in this

14   situation, especially because it does give the impression that

15   he tried to mislead the Probation Officer when reporting facts

16   about his military service to the Probation Officer.  Another

17   factor for your consideration.  For all these factors, we think

18   that he should be detained, Your Honor.

19           THE COURT:  Thank you, Mr. Eason.

20           Ms. Adams?

21           Thank you, Ms. Adams.

22           MS. ADAMS:  May I proceed?

23           THE COURT:  You may.

24           MS. ADAMS:  Thank you.  Your Honor, the military

25   records speak for themselves.  They state that he was -- they

1    recommended a discharge because he was charged with two

2    felonies and two misdemeanors.  That's exactly what it says.

3          But regardless of that, the way he was discharged

4    from the military has nothing to do with whether or not he's

5    going to show up for Court.

6          The purpose of bail or release or the conditions that

7    you may impose are to ensure that he will show up to take his

8    court settings.  His --

9          THE COURT:  Now, Ms. Adams, talk to me about why I

10   should release your client when he has failed 23 UAs?

11         MS. ADAMS:  So, Your Honor, in -- his mother

12   testified regarding that last week.  But in addition to that,

13   his failed UAs does not -- is not a factor to determine whether

14   or not he's going to show up to Court.

15         In regards to Exhibit Number 7 from the previous

16   setting, all the court settings are laid out and the motion for

17   the revocation is there as well.

18         What we don't see is him not coming to report.  What

19   we don't see is him not showing up to Court.

20         THE COURT:  No, we see him failing conditions.  So

21   how can I be assured that your client's going to be in

22   compliance with any conditions that I enter?

23         MS. ADAMS:  There are several ways.  Your Honor,

24   there can be a drug patch used.  He can use a SCRAM device.

25   There are several different conditions that can be used.

1           His prior drug use and the last prior drug use was

2   over a year ago per the report.  That a year -- that is a long

3   amount -- that is a great amount of time for a person to

4   abstain from using drugs.

5           We don't know if he's currently used drugs, but

6   again, the Court can provide conditions that will ensure that

7   he is not.

8           He can even -- the Court can even give a condition

9   for him to do outpatient treatment.  He can go to classes.

10  There are a variety of different things that the Court can

11  impose to ensure that Mr. Dunn will not use drugs and will

12  attend Court.

13          In regards to Exhibit A, the police reports that the

14  Prosecutor provided, in none of those reports does it state

15  that he resisted arrest, that he attempted to flee, that he did

16  not attend Court.

17          The same thing for Exhibit C.  He didn't go AWOL from

18  the military once he got in trouble.  He didn't stop reporting.

19          The Bail Reform Act, and I am referring to a 5th

20  Circuit case, and if you want the cite, Your Honor, I can

21  provide it, it is U.S. v. Bird.

22          And it states that detention is not authorized when

23  the Government merely wants it.  It has to be tied to one of

24  the six circumstances in the Bail Reform Act.

25          Mr. Dunn, there has been no credible or substantial

1    information that he is -- he has been a threat to law

2    enforcement or any other parties.

3              He has -- in those same reports, he didn't try to

4    harm the officers.  He didn't try to flee or anything like

5    that.

6              In addition, per the U.S. v. Byrd, a Defendant's

7    threat to safety or other persons or to the community standing

8    alone will not justify pre-trial detention.

9              Mr. Dunn has been in custody for 21 days.  And

10   there's now COVID in his jail.  And he's experiencing health

11   issues related to his back injury.  He has -- he now needs

12   dental services, because he had a injury to her -- to his

13   mouth.

14             And he's currently being held in a facility -- well,

15   they relocated him to another part of the jail, where he's

16   essentially -- they're using tactics by leaving the light on

17   for 24 hours a day for the past three days, so that he can't

18   even properly get rest.

19             Whether or not Mr. Dunn was deployed or not deployed

20   has no standing on whether or not he will show up to Court.

21             What we do know is that he shows up to Court.  He

22   showed up to Probation.  He doesn't flee.  He doesn't resist

23   arrest.

24             He doesn't own any firearms, because they took them.

25   He's not a convicted felon.  He's never been convicted of any

1    crime.

2            What we do know is, other than his military service,

3    he's been in the Eastern District for his -- the entirety of

4    his life other than two years and other than his military

5    service.

6            Mr. Dunn, based on his own court records, shows up.

7    There's no failure to appear.  There's no --

8            THE COURT:  You keep saying that, Ms. Adams, and I

9    understand that you're making the representation that he's

10   going to show up, but that's not the only thing that this Court

11   has to consider.

12           And I am concerned about his failed UAs and the fact

13   that he was living with his parents when he failed those.  How

14   am I to be assured that he's not going to go home and use drugs

15   with his parents monitoring him?  What have you done to ensure

16   that I should not have that concern?

17           MS. ADAMS:  Well, Your Honor, his parents don't use

18   drugs.  They -- his mom and his dad, neither have a criminal

19   record.

20           They are willing to let him -- he lives in a separate

21   house, but they are willing to let him live in their house and

22   let Probation come to their house, if that's what's needed to

23   be done.

24           THE COURT:  Do you have any further comments, Ms.

25   Adams?

1          MS. ADAMS:  No, Your Honor.

2          THE COURT:  Mr. Eason, anything further?

3          MR. EASON:  He shows up when he doesn't -- but

4    sometimes he doesn't show up.  Over 30 missed urinalysis in the

5    Defense own records, again, showing that he can't comply with

6    Supervised Release.

7          THE COURT:  All right, the Court's going to take this

8    matter under advisement momentarily.  If I can have the

9    Government representative, and counsel, and the remainder of

10   the cases pending before the Court approach, please?

11         MR. EASON:  Yes, Your Honor.

12       (Recess at 9:55 a.m., recommencing at 11:11 a.m.)

13         THE COURT:  All right, at this time, the Court is

14   going to return to cause number 420CR142, the United States of

15   America v. Daniel Austin Dunn.

16         Mr. Dunn, if you can come forward.

17         If I can also ask for Mr. and Mrs. Dunn to come

18   forward, please.

19         All right, the Court following the conclusion of the

20   prior proceeding and today's proceedings, has determined to

21   release Mr. Dunn, subject to his own -- if you all will just

22   come -- over close to Ms. Adams.

23         The Court has determined to release Mr. Dunn subject

24   to his own personal recognizance and some very extraordinarily

25   strict conditions, as well as an appearance bond of $50,000.

1          Now we'll just note at the outset of the -- following

2    that statement, it is the Court's understanding that the

3    Government intends and does in fact request to stay the Court's

4    order releasing Mr. Dunn; is that correct?

5          MR. EASON:  That is correct at this time, Your Honor.

6          THE COURT:  Okay, and the Court is going to grant the

7    request to stay.  And so, we are going to discuss the

8    conditions under which I would order Mr. Dunn released.

9          But notwithstanding that, I'm the magistrate judge.

10   And because Mr. Eason has requested a stay, the Government has

11   the right to appeal my decision to the District Court, who will

12   then determine whether or not my decision was correct.

13         So we're going to go ahead and go over these

14   conditions, but I just need to make sure everyone knows that in

15   light of the request for stay, Mr. Dunn is not being released

16   today.

17         All right, so Mr. Dunn, and then as well his parents,

18   if I might ask each of you to please raise your right hand to

19   the best of your ability at this time.

20      (The Defendant, Mr. Rick Dunn, and Ms. Judy Dunn are

21   sworn)

22         THE COURT:  Okay, so I'm going to be talking with

23   each of you regarding these orders.  And so, we're going to

24   begin with Mr. and Mrs. Dunn, Mr. Dunn's parents.

25         The Court has handed down this proposed order setting

1    conditions of release.  Have you had an opportunity to review

2    these conditions?

3              And if you can -- I'm going to need to have you all

4    on record.  So if you all can step up to that microphone.

5              MR. R. DUNN:  Yes, ma'am.

6              THE COURT:  And can you just tell me you have

7    reviewed the conditions, Mr. and Mrs. Dunn, I need both of you

8    to tell me yes.

9              MR. R. DUNN:  Yes, ma'am.

10             MS. J. DUNN:  Yes.

11             THE COURT:  Okay, and you've had an opportunity to

12   talk with your sons' lawyer about each and every one of these

13   conditions?

14             MR. R. DUNN:  Yes, ma'am.

15             MS. J. DUNN:  Yes, ma'am.

16             THE COURT:  Okay, and you understand that what I'm

17   doing is I'm placing your son in your custody?

18             MR. R. DUNN:  Yes, ma'am.

19             MS. J. DUNN:  Yes, ma'am.

20             THE COURT:  Okay, and you understand that as a

21   requirement of him being placed in your custody, you will be

22   required to transport him for any UAs or any other assessments

23   that the Court has ordered?

24             MR. R. DUNN:  Yes, ma'am.

25             MS. J. DUNN:  Yes, ma'am.

1          THE COURT:  All right.  And as well, you understand

2    that he is required to live within your residence and is not

3    permitted to travel or traverse the remainder of your property?

4          MR. R. DUNN:  Yes, ma'am.

5          MS. J. DUNN:  Yes, ma'am.

6          THE COURT:  Okay, now there is one thing.  I know you

7    were sitting here in Court, and so, you heard I have some very

8    strong concerns regarding your son's past drug use when and at

9    a time that he was in residence with you.

10          And so, I need both of you to assure me at this time

11   having been placed under oath that you fully intend to monitor

12   your son and that if there is any drug usage whatsoever, that

13   you will report it?

14          Mrs. Dunn?

15          MS. J. DUNN:  Yes, ma'am.

16          THE COURT:  And Mr. Dunn?

17          MR. R. DUNN:  Yes, ma'am.

18          THE COURT:  Do each of you fully understand what your

19   obligations are as a third-party custodian?

20          Mrs. Dunn?

21          MR. J. DUNN:  Yes, ma'am.

22          THE COURT:  Mr. Dunn?

23          MS. R. DUNN:  Yes, ma'am.

24          THE COURT:  So you each understand that it is your

25   obligation, if he is released, to supervise him and ensure that

1    he is in compliance with each and every one of these

2    conditions?

3              Mrs. Dunn?

4              MR. J. DUNN:  Yes, ma'am.

5              THE COURT:  And Mr. Dunn?

6              MS. R. DUNN:  Yes, ma'am.

7              THE COURT:  You understand that it is your obligation

8    to ensure that he appears at every court appearance?

9              Mrs. Dunn?

10             MR. J. DUNN:  Yes, ma'am.

11             THE COURT:  And Mr. Dunn?

12             MS. R. DUNN:  Yes, ma'am.

13             THE COURT:  And each of you further understand that

14   it is your obligation if he violates even one of these

15   conditions to notify the Court immediately?

16             Mrs. Dunn?

17             MR. J. DUNN:  Yes, ma'am.

18             THE COURT:  And Mr. Dunn?

19             MS. R. DUNN:  Yes, ma'am.

20             THE COURT:  And I need each of your assurances, while

21   you were under oath, that you feel competent and capable of

22   reporting him should he violate.

23             Mrs. Dunn, I understand he is your son.  Are you sure

24   that you are able to report him if he violates?

25             MR. J. DUNN:  Yes, ma'am.

1          THE COURT:  And Mr. Dunn?

2          MS. R. DUNN:  Yes, ma'am.

3          THE COURT:  All right, at this time, I do find having

4    spoken with each of you that you do qualify as appropriate

5    third-party custodians and you may be seated.

6          All right, Mr. Dunn, if you'll step forward.  You're

7    under oath.  You understand this is your signature?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  All right, do you understand that I am

10   going to order you released subject to certain conditions?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  All right, I've also ordered an

13   appearance bond.  Is this your signature on the appearance

14   bond?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  So you understand there's a $50,000

17   unsecured appearance bond in connection with your case as well?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  All right, do you first off understand

20   that the Government's requested a stay, so you're not being

21   released at this time.

22         You're going to go back into the custody of the

23   Marshal Service and you will be there until such time as the

24   Government has an opportunity to appeal my decision to the

25   District Court?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right, notwithstanding that, you have

3     gone over each and every one of these conditions and you

4     understand each and every one of them?

5          THE DEFENDANT:  Yes, Your Honor, I do.

6          THE COURT:  And if you were to be ordered released,

7     you would be in compliance with each of these conditions?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  All right, we've had a lot of discussion

10    here today about your past failure to honor conditions that

11    were entered by the Court.

12          And so, I need to know while you're here under oath

13    that you are promising me that you are going to be in

14    compliance with each and every one of these conditions?

15          THE DEFENDANT:  Yes, Your Honor, I promise.

16          THE COURT:  And do you further understand that if you

17    have even one violation, this is not state court, if you

18    violate, if you have one dirty UA, you are going back into

19    custody.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you fully understand that?

22          THE DEFENDANT:  Yes, Your Honor, I do.

23          THE COURT:  And have you and Ms. Adams discussed that

24    it will negatively impact your case if you are revoked off of

25    your conditions?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Now the law does require that I admonish

3     you as well regarding other consequences should you fail to

4     comply.  So I'll do that at this time.

5          Do you understand that failing to appear in court is

6     required as a crime for which you may be sentenced to

7     imprisonment?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Do you understand if you violate any

10    condition of release, a warrant for your arrest may be issued,

11    and you may be jailed until trial and prosecuted for contempt

12    of court?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Do you understand that committing a crime

15    while you are on release may lead to more severe punishment

16    than you would otherwise receive for committing the same crime

17    at any other time?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  And do you further understand it is a

20    crime to try to influence, threaten, attempt to bribe, or

21    retaliate against any juror, witness, or other person who may

22    have information about your case or otherwise obstruct the

23    administration of justice?

24         THE DEFENDANT:  Yes, Your Honor, I do.

25         THE COURT:  So you fully understand what could happen

1    to you if you do not comply with these conditions?

2              THE DEFENDANT:  Yes, Your Honor, I do.

3              THE COURT:  All right, at this time, the Court will

4    sign this proposed order setting conditions of release.  And I

5    will hereby order it docketed.

6              Notwithstanding that, I further order execution of

7    this order to be stayed pending the Government's appeal of this

8    decision to the District Court.

9              Is there anything further from the Government at this

10   time?

11             MR. EASON:  No, Your Honor.

12             THE COURT:  Is there anything further, Ms. Adams?

13             MS. ADAMS:  Yes, Your Honor.  I -- my question is in

14   regards two things.  One, Mr. Dunn does own a separate

15   business, that we did talk about at that initial hearing on

16   June 18th, that he runs online.  To make things clear, is it

17   okay that the business is still run, not by him, but by his

18   family?

19             THE COURT:  If what I'm hearing -- I think what I'm

20   hearing you ask is that he's going to be doing the

21   leatherworking.  And to the extent there's anything online that

22   needs to be done, that it would be his family who would

23   continue?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Let me ask Mr. Eason, obviously, I

1    understand that you object to the Court releasing Mr. Dunn in

2    any form or fashion, but if his business were to be operated in

3    that manner, does the Government have any objection to him

4    continuing his leatherworking activities in his parents'

5    residence?

6              MR. EASON:  I don't -- I can't think of a condition

7    that prevents him from working with leather in the residence.

8              THE COURT:  I do not either.  So long as he is only

9    using the leatherworking and anything Internet or otherwise is

10   relegated to his parents, I don't see that that would be in

11   violation of his conditions.

12             Again, he's restricted to the residence.  Nowhere

13   else on the property.  I understand that this is a ranch.

14   Nowhere else, no out buildings no other.  Restricted to the

15   residence.  And that's if my conditions are upheld by the

16   District Court.

17             Anything further, Mr. Eason?

18             MR. EASON:  Not at this time, Your Honor.

19             THE COURT:  All right, Ms. Adams?

20             MS. ADAMS:  Yes, also Your Honor, in regards to your

21   stay, I understand that you've already granted it, but I need

22   to put --

23             THE COURT:  Okay, go ahead.

24             MS. ADAMS:  I'm going to ask that you deny the stay

25   and let Mr. Dunn be released.  If the district judge would like

1    to not uphold your ruling, we all know where Mr. Dunn will be

2    and he can be quickly and easily taken into custody.

3              THE COURT:  And certainly I hear your argument, but

4    I'm going to grant the stay.  And he'll remain in custody until

5    such time as the Government has an opportunity to file the

6    stay, which I assume they'll file it today.  And then, the

7    District Court will set that or proceed however the District

8    Court decides to.

9              Okay, thank you, everyone.  We will be adjourned.

10             MR. EASON:  Thank you, Your Honor.

11        (Proceedings concluded at 11:19 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **CERTIFICATE**

2

3

4              I, Chris Hwang, court approved transcriber, certify

5      that the foregoing is a correct transcript from the official

6      electronic sound recording of the proceedings in the above-

7      entitled matter.

8

9

10

11

12

13      _____          July 6, 2020

14      Chris Hwang                       Date

15      Transcriber

16

17

18

19

20

21

22

23

24

25